## HENRY GERNER v. EDWARD A. CHURCH ET AL.

FILED FEBRUARY 5, 1895. No. 6323.

1. **Contracts:** SUBSCRIPTION TO PRIVATE ENTERPRISE: SEATING CAPACITY OF THEATRE. Henry Gerner signed a contract or subscription paper, agreeing to pay Edward A. Church and Henry Oliver, or order, $200 on condition they should erect or cause to be erected on the southwest corner of P and Thirteenth streets, in the city of Lincoln, in a time specified, an opera house covering a space of ground 100 feet front on P and 142 feet deep on Thirteenth street. The audience room and galleries of such opera house were to have a seating capacity of seventeen hundred. The subscription was payable in installments, but all due when the opera house was completed and ready for occupancy. In a suit by Church & Oliver against Gerner on said subscription, the court instructed the jury: "By 'seating capacity of seventeen hundred,' as used in said contract of subscription, is meant the

capacity of said opera house to seat seventeen hundred auditors on permanent or temporary seats so that they can both hear and see the exhibition given from the stage and still leave sufficient room in the passage-ways for the auditors to pass to and from their seats going in and out of the building." *Held*, (1) That the instruction was correct; (2) that in order for the opera house as constructed to comply with the subscription contract as to seating capacity, it was not necessary that the audience room and galleries should have seventeen hundred fixed and permanent seats.

2. ———: ———: CITY ORDINANCES. On such trial Gerner offered to prove that the opera house constructed by Church & Oliver was erected with a trussed roof; that the outside or inclosing walls were 65 feet high and 142 feet in length; that the building was constructed without any cross-walls of equal height with the inclosing walls, and that the outside walls were of an average thickness of not to exceed seventeen inches. This evidence the court excluded. Gerner also offered in evidence section 513 of the Municipal Code of the city of Lincoln, in force at the time the subscription contract was made and the opera house built, and which provided : "The outside walls of rooms having trussed roofs or ceilings, such as churches, public halls, theaters, * * * if more than fifteen and less than twenty-five feet high, shall average at least sixteen inches; if over twenty-five feet high, at least twenty inches; if over forty-five feet high, at least twenty-four inches in thickness. An increase of four inches in thickness shall be made in all cases where the walls are over 100 feet long, unless there are cross-walls of equal height." This evidence the court excluded. *Held*, (1) That the subject-matter of the ordinance was within the legislative jurisdiction of the city council; (2) that the ordinances were within the rule that the law of the place where a contract is made enters into and becomes a part of such contract; (3) that Gerner's contract was one of donation; and that the courts cannot presume that he agreed to make this donation upon any other terms than that Church & Oliver should construct a building in accordance with the ordinances of the city in which such building was erected; (4) that the court erred in excluding the evidence.

3. ———: ———: PAROL EVIDENCE TO CONTRADICT WRITING. On the trial Gerner offered to testify that at the time of signing the contract in suit that Church & Oliver promised him that the opera house should be constructed of stone in its first story; of pressed brick with cut stone trimmings above the first story,

and copper cornices. This evidence the court excluded. *Held*, (1) That the evidence offered did not tend to explain, but to contradict and alter the agreement between the parties; (2) that it did not tend to show that Gerner was induced by the fraud of Church & Oliver to execute the contract; (3) that there was no ambiguity in the contract; (4) that the court did not err in excluding the evidence.

4. ———: ———: ———. In a suit on a written contract for a subscription payable on certain conditions mentioned in such contract, parol evidence is not admissible, in the absence of fraud, to show that the subscriptions were not to be payable except upon certain other conditions not enumerated in the contract.

5. ———: ———: SHAM SUBSCRIBERS: FRAUDULENT·MISREPRESENTATIONS. On the trial Gerner introduced in evidence a writing signed by Church & Oliver bearing the same date as the subscription paper in suit. This writing was delivered to one Marshall and recited that he had signed a subscription paper agreeing to pay Church & Oliver $1,000 for the building of the opera house. The writing was in effect a modification of Marshall's contract of subscription as it made the subscription payable when Marshall had sold certain described real estate. Gerner was then asked certain questions by his counsel, which tended to elicit evidence showing that at and before the time he signed the contract in suit Church & Oliver represented to him that Marshall had subscribed a similar contract for $1,000, which would be payable on the same conditions as would Gerner's subscription if he signed it. This evidence the court excluded. *Held*, (1) That the evidence tended to show a material misrepresentation made by Church & Oliver to Gerner which induced him to execute the contract in suit; (2) that the court erred in excluding the evidence.

6. ———: ———: ———: ———. It is competent for a party when sued upon a written contract to show by parol that he was induced to execute the contract by the fraud or material false representation of the party seeking to enforce it.

7. Parties: REAL PARTY IN INTEREST. After the opera house was completed, and before the bringing of this suit, Edward A. Church made in writing and delivered to Henry Oliver and one James F. Lansing a writing in and by which he assigned to said Oliver and Lansing "all his right and interest in and to said subscriptions and donations." The district court instructed the jury that Church & Oliver were the real parties in interest in this suit. *Held*, (1) That the real parties in interest in this suit are

the parties entitled to the donations and subscriptions; (2) that, so far as the record showed, such parties were Henry Oliver and James F. Lansing; (3) that the court erred in instructing the jury that Church & Oliver were the real parties.

ERROR from the district court of Lancaster county. Tried below before HALL, J.

The facts are stated by the commissioner.

*Webster, Rose & Fisherdick,* for plaintiff in error:

The law under which parties contract is part of the contract, and their obligations are determined with reference to it; and they are presumed to have intended the contract shall be construed, and obligations determined by it, as though written in it. The ordinances of the city of Lincoln relating to use and construction of theatre buildings, and proof of plaintiff's failure to comply therewith, were therefore erroneously excluded. (*Dorrington v. Myers,* 11 Neb., 389; *Sessions v. Irwin,* 8 Neb., 8; *Jones v. Nebraska City,* 1 Neb., 179; *Stewart v. Otoe County,* 2 Neb., 183.)

The court erred in excluding evidence of the representations of plaintiffs respecting the general character, appearance, cast, and fronting of the building. The subscription contract did not embody all that was promised by plaintiff, and oral evidence was admissible to prove the terms of the agreement on plaintiff's part, and to show that the subscription was fraudulently obtained. (*Fremont Ferry & Bridge Co. v. Fuhrman,* 8 Neb., 103; *Simpson v. Armstrong,* 20 Neb., 514; *Goodrich v. McClary,* 3 Neb., 130; *Nindle v. State Bank,* 13 Neb., 246; *New York Exchange Co. v. De Wolf,* 31 N. Y., 273; *Jones v. Milton & Rushville Turnpike Co.,* 7 Ind., 547; *Groff v. Pittsburgh & S. R. Co.,* 31 Pa. St., 489; *Perkins v. Bakron,* 45 Mo. App., 248.)

The colorable subscription of Marshall, used to puff and stimulate subscriptions by others, was a fraud on other sub-

scribers, and avoided subscriptions obtained by representation that Marshall was a *bona fide* subscriber. (*Melvin v. Lamar Ins. Co.*, 80 Ill., 446; *Cleveland Iron Co. v. Ennor*, 2 West. Rep. [Ill.], 831.)

Plaintiff Church had parted with his right' prior to institution of the suit, and plaintiffs were therefore not the real parties in interest, and are not entitled to recover. (*Hoagland v. Van Etten*, 23 Neb., 463.)

*G. M. Lambertson*, also for plaintiff in error:

Subscriptions made to a private person, to assist a private enterprise, on the faith of a prior subscription, absolute on its face, but which ambushes a secret agreement by which the subscriber is released, or his subscription avoided, are voidable at the option of the subscriber, where it appears that such sham subscription was used as a decoy to secure such subsequent subscription. (*Middlebury College v. Loomis*, 1 Vt., 208; *Memphis Branch R. Co. v. Sullivan*, 57 Ga., 240; *Salem Mill-Dam Corporation v. Ropes*, 6 Pick. [Mass.], 23; *Central Turnpike Corporation v. Valentine*, 10 Pick. [Mass.], 142; *Somerset & K. R. Co. v. Cushing*, 45 Me., 524; *Rutz v. Esler & Ropilquet Mfg. Co.*, 3 Brad. [Ill.], 83; *Chester v. Bank of Kingston*, 16 N. Y., 336; 1 Wharton, Contracts, sec. 529; 2 Addison, Contracts, p. 317; *New York Exchange Co. v. De Wolf*, 31 N. Y., 273; *Middlebury College v. Williamson*, 1 Vt., 225.)

*Pound & Burr, contra:*

Evidence as to whether the width and height of the walls conformed to the city ordinances was properly excluded. A mere police regulation of the city of Lincoln is not a statute or rule of law within the meaning of the rule that contracts are to be construed with reference to the law; nor are such regulations in the nature of statutes. The city authorities are the proper persons to enforce them. (*Markle v. Town Council of Akron*, 14 O., 586.)

The conditions are fully and unambiguously stated in the subscription in writing. The testimony regarding the character of the proposed building was properly excluded. Such evidence would not explain, but would contradict and alter the written agreement. (*Traver v. Schaefle*, 33 Neb., 531; *Nindle v. State Bank*, 13 Neb., 245; *Simpson v. Armstrong*, 20 Neb., 512.)

RAGAN, C.

On the 10th day of April, 1891, Henry Gerner and a number of other parties signed and delivered to Edward A. Church and Henry Oliver a writing or subscription paper in words and figures as follows:

"LINCOLN, NEB., April 10, 1891.

"Know all men by these presents, that we, the undersigned property owners in the city of Lincoln, Nebraska, hereby undertake, promise, and agree to pay to Edward A. Church and Henry Oliver, or order, the sums of money set opposite our respective names upon the condition only that said Church & Oliver shall erect and complete or cause to be completed ready for occupancy on or before January 1, 1892, an opera house building which shall cover a space of ground at least 100 feet front on P street and 142 feet deep on Thirteenth street, in the city of Lincoln, Neb., to be erected at the southwest corner of said P and Thirteenth streets. Said opera house to have an audience room on ground floor with a seating capacity of not less than seventeen hundred, including seating capacity of galleries, said opera house to have not less than two galleries, ladies' and gents' toilet rooms, and to be modern in all its appointments. Said building to have store-rooms around said audience room on ground floor.

"Said sums by us subscribed to be paid as follows, viz.: One-third when the walls of said building are completed to the top of third story and floor joists laid thereon; one-

third when the roof is on said building, and one-third when said building is completed and ready for occupancy.

"HENRY GERNER.   $200.00."

This suit was brought in the district court of Lancaster county by said Edward A. Church and Henry Oliver against the said Henry Gerner to recover the amount of the latter's subscription.   Gerner interposed to the action six defenses:

(1.) A general denial.

(2.) That the audience room, including the two galleries of the opera house erected by Church & Oliver, did not. have a seating capacity of seventeen hundred.

(3.) That at the time Gerner signed said subscription, and at the time Church & Oliver erected the opera house mentioned therein, there was in force in the city of Lincoln an ordinance which provided: "The outside walls of rooms having trussed roofs or ceilings, such as public halls, theatres,   *   *   .*   if more than fifteen and less than twenty-five feet high, shall average at least sixteen inches; if over twenty-five feet high, at least twenty inches; if over forty feet high, at least twenty-four inches in thickness.   An increase of four inches in thickness shall be made in all cases where the walls are over one hundred feet long, unless there are cross-walls of equal height;" that the building mentioned in the premises and erected by Church & Oliver was a theatre with a trussed roof, and the ceiling of the audience room was over forty-five feet in height and the walls were more than one hundred feet long, and that the provisions of said ordinance were applicable to said theatre or opera house, and said ordinance entered into and became a part of the subscription contract of said Gerner; that the opera house erected by Church & Oliver had no cross-walls as provided by said ordinance; that the outside walls of the opera house were of an average thickness of not to exceed seventeen inches.

(4.) That Church & Oliver, to induce Gerner to execute said subscription contract, represented to him that one Whitney J. Marshall had signed a similar subscription paper donating to them $1,000, and that he, Gerner, by executing the subscription contract in suit would be making a contract identical with that made with Church & Oliver by Marshall, except as to the amount of the subscription; that Gerner, believing and relying on said representations made by Church & Oliver, executed the subscription contract in suit; that the representations made by Church & Oliver as to the character of Marshall's subscription were false and known by Church & Oliver to be false, and made with intent to, and did, deceive him, Gerner; that Church & Oliver, at the time Marshall signed the subscription paper, agreeing to donate $1,000 towards the erection of an opera house, made and delivered to him a separate agreement in writing, by which it was in effect provided that Marshall's subscription should not be enforced according to its terms. The existence of this last agreement between Marshall and Church & Oliver were by the latter fraudulently concealed from Gerner.

(5.) That Church & Oliver, to induce Gerner to execute said subscription paper, promised the latter that they would build a structure as fine, imposing, and sightly and as substantial as the building known as the Burr building and the Brace building; the first story to be of stone and the upper stories to be of pressed brick with stone trimmings and copper cornices and ornaments, and to cost from $125,-000 to $150,000, and that the front and main entrance of said building should be on P street, on which the defendant owned property in the immediate vicinity of said proposed opera house; that these promises made by Church & Oliver induced Gerner to execute the subscription contract sued upon; that Oliver & Church did not construct said opera house with the front on P street, did not build the first story of stone, nor build a substantial, imposing,

and sightly structure with copper cornices and ornaments, and that the building constructed did not cost $125,000.

(6.) That the action was not brought in the names of the real parties in interest; that before the bringing of the suit Edward A. Church had assigned all his interest in the subscription contract to James F. Lansing and Henry Oliver.

Church & Oliver replied to this answer by a general denial of all the allegations therein. There was a trial to a jury, and a verdict and judgment in favor of Church & · Oliver, and Gerner brings the case here on error.

In the course of this opinion we shall review all the errors assigned by Gerner in his petition in error, but without following the order in which such errors are assigned.

1. At the trial a very large part of the evidence was directed to the issue made by the pleadings, as to whether the audience room, including the galleries of the opera house as constructed, had a seating capacity of seventeen hundred; and it is strenuously and at length argued here by counsel who represent the plaintiff in error that the finding of the jury in favor of Church & Oliver on this issue lacks sufficient competent evidence to support it. In addition to the evidence introduced under this issue the jury, by consent of the parties, visited the opera house and examined it. The question at issue was capable of being determined by a man or men of ordinary intelligence from an actual examination and inspection of the audience room and galleries of the opera house. We think the evidence in the record is sufficient to sustain the finding made by the jury on this issue, even if the jury had not examined the premises; and since the finding of the jury is based not only upon the evidence of witnesses as to the capacity of the opera house, but upon knowledge obtained by them from an actual examination of it, their finding is conclusive. We cannot presume that the jury, in the examination of the premises, acted otherwise than impartially, nor

that in estimating the capacity of the opera house they adopted a wrong theory, as the district court charged the jury on the subject as follows: "By 'seating capacity of seventeen hundred,' as used in said contract of subscription, is meant the capacity of said opera house to seat seventeen hundred auditors on permanent or temporary seats, so that they can both hear and see the exhibition given from the stage and still leave sufficient room in the passage-ways for the auditors to pass to and from their seats going in and out of the building." This instruction was correct, and the presumption is that the jury followed it. In order for the opera house, as constructed, to comply with the subscription contract as to the seating capacity of the former it was not necessary that the audience room and galleries should have therein seventeen hundred fixed and permanent seats.

2. On the trial Gerner offered testimony tending to prove that the opera house constructed by Church & Oliver was erected with a trussed roof; that the outside, or inclosing walls were 65 feet high and 142 feet in length; and that the building was constructed without any cross-walls of equal height with the inclosing walls, and that said outside walls were of an average thickness of not to exceed seventeen inches. Gerner also offered in evidence section 513 of the Municipal Code of the city of Lincoln, which provides: "The outside walls of rooms having trussed roofs or ceilings, such as churches, public halls, theatres, dining rooms, and the like, if more than fifteen and less than twenty-five feet high, shall average at least sixteen inches; if over twenty-five feet high, at least twenty inches; if over forty-five [feet high], at least twenty-four inches in thickness. An increase of four inches in thickness shall be made in all cases where the walls are over one hundred feet long, unless there are cross-walls of equal height." The exclusion of this evidence is the second error assigned here. Whether the court erred in ex-

cluding this evidence depends upon whether the ordinances of the city of Lincoln were incorporated into and became a part of the contract between Gerner and Church & Oliver. It is a general rule that contracts are to be construed according to the law of the place of their execution, and that the law in force upon any subject which is made the subject-matter of a contract is incorporated into and becomes a part of such contract, as much so as if the law were actually made a part of the agreement between the contracting parties. (*Jones v. Nebraska City*, 1 Neb., 176; *Stewart v. Otoe County*, 2 Neb., 177; *Sessions v. Irwin*, 8 Neb., 5; *Dorrington v. Myers*, 11 Neb., 388.) The correctness of this rule is not controverted by counsel for Church & Oliver, but their contention is that the ordinances of the city of Lincoln are not within such rule.

In *Brady v. Northwestern Ins. Co.*, 11 Mich., 425, Brady owned a wooden building in the city of Detroit. It was insured by the insurance company against loss or damage by fire on the 1st of January, 1856, for one year. In accordance with the provisions of the policy, at the expiration of the year it was renewed for another, and from year to year until the 1st of January, 1861, when the policy was renewed for still another year. Some time in February, 1861, the building was partially destroyed by fire. The policy provided that the insurance company might pay the amount of the loss sustained in money or at its option rebuild or repair the building with the same kind of material of which it was constructed. At the time the policy was renewed, on January 1, 1861, there was in force in the city of Detroit an ordinance of that city which prohibited the rebuilding or repair of wooden buildings partially destroyed by fire in that part of the city in which was situate the building of Brady. Brady sued the insurance company on its contract of insurance. The property was insured for $2,000. The evidence showed that the undestroyed material of the insured building was worth about $100; but if

the insurance company was allowed to use wood and repair the building, it could do so at a cost of something over $800. The contention of the insurance company was that the ordinance of the city of Detroit was not a part of its contract of insurance, and since it was not allowed to repair the building it was only liable to Brady for what it would cost it to rebuild the building with wood if it was permitted to do so. Martin, C. J., delivering the opinion of the court, said: "The fair and reasonable interpretation of a policy of insurance against loss by fire will include within the obligation of the insurer every loss which necessarily follows from the occurrence of the fire, to the amount of the actual injury to the subject of the risk, whenever that injury arises directly and immediately from the peril, or necessarily from incidental and surrounding circumstances the operation and influence of which could not be avoided. Under this rule what was the plaintiff's loss in the present case? The property insured was situated within the fire limits of Detroit, within which the reconstruction or repair of any wood building injured by fire was prohibited, unless by leave of the common council. * * * This charter and these ordinances were in existence at the time of the last renewal of the policy. They were local laws affecting the property, and the risk which the defendant assumed, and of which the latter is presumed to have had knowledge and to have estimated in renewing the policy. * * * 'The risk was not taken upon a mere collection of beams, boards and other materials, thrown together without purpose or special adaptation. It was upon a building for trade, situated within a particular locality, within the jurisdiction of municipal authorities vested with legislative powers for special purposes, and subject to the exercise of those powers;' and the parties must be regarded as contracting with a full knowledge of all the facts and the law, and the risk to which the property was thereby subjected;" and the court held that Brady was entitled to recover the whole

insurance, and was not limited to such a sum as would cover the cost of repairing the building with wood, and that the insurance contract was governed by the local ordinance in force in the city of Detroit at the time of its issuance.

In *Cordes v. Miller*, 39 Mich., 581, a landlord covenanted in his lease with the tenant that in case the building on the leased premises should be destroyed by fire that he would rebuild it. The building on the leased premises was of wood and was destroyed by fire. After the execution of the lease between the parties the city council of Grand Rapids, in which said leased building was situate, passed an ordinance forbidding the erection of wooden buildings in that part of said city in which the landlord's premises were situate. The tenant sued the landlord on his covenant to rebuild, and the court held that the landlord was released from his contract to rebuild the wooden building by the passage of the ordinance forbidding it.

These authorities recognize the doctrine that the ordinances of a city are within the rule that the law of the place where the contract is made enters into and becomes a part of such contract when the subject-matter of the contract is within the legislative jurisdiction of the city council. If the ordinances of the city of Lincoln had prohibited the erection of a wooden building where the opera house is situate, and the contract between Gerner and Church & Oliver had expressly provided that the latter should erect a wooden theatre on the site now occupied by the opera house, it certainly cannot be questioned that neither of the parties to such contract could have enforced it against the other. The contract in suit between the parties does not by its terms require Church & Oliver to erect a building of the character prohibited by the ordinances of the city; but the ordinances of the city were as much a part of Gerner's contract with Church & Oliver as if they had been written therein. In other words, the

contract should be construed as though it read that Gerner would pay to Church & Oliver $200 when they erected an opera house covering a space of ground 100x142 feet on the site named, in accordance with the ordinances of the city of Lincoln regulating the construction of such buildings. The contract of Gerner is a donation pure and simple, but it is not voidable for that reason; but because it is a donation the contract must be strictly construed in his favor, and the courts will not presume that Gerner agreed to make this donation upon any other terms than that Church & Oliver should build a building of the dimensions and at the time and place stated in the contract, and construct such building in accordance with the ordinances of the city in which it was to be erected. We think therefore that the learned district judge erred in excluding the evidence offered.

It is suggested in the briefs of counsel for Church & Oliver that they were compelled to and did procure a permit from the city authorities of Lincoln for the construction of this building. We do not find this permit in the record; and if the record contained such evidence, we do not think that fact would render the ruling of the district court under consideration less erroneous. We cannot presume that this permit, if it was issued, authorized Church & Oliver to construct a building contrary to the ordinance on the subject; and if the permit did authorize the building to be constructed otherwise than in compliance with the ordinance, such permit itself would be a nullity.

3. On the trial Gerner offered to testify that at the time of signing the contract in suit that Church & Oliver represented and promised him that the opera house would be constructed of stone in its first story and of pressed brick with cut stone trimmings above the first story, with cornices of ornamental metal work of copper, and that the front of the building was to be on P street, and that it was not so constructed. The exclusion of this evidence by the

court is the third error assigned here. To support their
argument that the court erred in excluding this evidence
counsel cite us; among others, to the following authorities:
*Goodrich v. McClary,* 3 Neb., 123; *Fremont Ferry & Bridge
Co. v. Fuhrman,* 8 Neb., 99; *Nindle v. State Bank,* 13 Neb.,
245. None of these cases, however, sustain the contention
of plaintiff in error. The facts in the case in 3 Nebraska
were that G. and M. had entered into an agreement
by which G. agreed to deliver to M. his cutting of wool
on a day named. The contract was silent as to the num-
ber and kind of sheep which G. owned at the time the
contract was made, and it was held that parol testimony
was admissible to show that fact. This decision rests
upon the principle that parol evidence is admissible to
supply an omission in a written contract which in case
of disagreement between the parties would otherwise be
ambiguous. The facts in the case in 8 Nebraska were
that a bridge company had a toll bridge across the Platte
river. This bridge was destroyed. The company then
passed a resolution that it would not build another bridge
—that is, rebuild the bridge—unless aided by donations
from citizens. Under this resolution Fuhrman signed
his name, agreeing to donate $100. The company built
another bridge, but not in the place where the bridge de-
stroyed stood. In a suit by the bridge company against
Fuhrman the court held that a change of the location of
the bridge having been made without his consent he was
not liable upon the subscription; but the fair and legitimate
construction of Fuhrman's contract in that case was that
he would give the bridge company $100 to rebuild the
bridge destroyed; and by rebuilding the bridge destroyed
was clearly implied that it should be built on the *situs* oc-
cupied by the first bridge. The facts in 13 Nebraska were
that K. and N. had leased certain premises for the term of
six months from the 6th day of December, 1881. The lease
then stated that "which term will end on the 6th day of

May, 1882," and the court held that there was no uncer-
tainty or ambiguity in the terms of the lease, as the date,
May 6, was an error of computation, and that the lease did
not expire by its terms until June, 1882, and that the parol
evidence was not admissible to show when the lease did ter-
minate. The effect of this evidence excluded would be to
modify and alter the terms of the agreement between the
parties and to introduce additional conditions into the con-
tract. The evidence offered does not tend to explain, but
contradicts and alters the agreement between the parties.
There is no ambiguity in the contract in suit. By the con-
tract between the parties the building was to cover a space
of ground at least 100 feet front on P street and 142 feet
deep on Thirteenth street, and the evidence in the record
shows that the building had two fronts, one on P and one
on Thirteenth street. To permit Gerner to prove in this
suit that Church & Oliver agreed that they would construct
the first story of this opera house of stone and that part
above the first story with pressed brick, with cut stone
trimmings and copper cornices, would be to make a new
contract for the parties, not to construe the one they have
made. This evidence did not tend to show, nor was it of-
fered upon the theory that the contract sued upon is not the
contract made,—that is, the evidence is not offered by Ger-
ner upon the theory that any of the agreements between him
and Church & Oliver which were to be written in the contract
were omitted therefrom ; nor that any provision written in
the contract is different from the one made; but the evi-
dence offered by Gerner tends to establish another and a dif-
ferent contract between him and Church & Oliver than the
one reduced to writing between the parties and made the
subject of this suit. In other words, the evidence does not
tend to show that Gerner was induced by the fraud of
Church & Oliver, or either of them, to execute the contract
in suit. In a suit on a written contract for subscription,
payable on certain conditions mentioned in such contract,

parol evidence is not admissible, in the absence of fraud, to show that the subscriptions were not to be payable except upon certain other conditions not enumerated in the contract. (*Jones v. Milton & Rushville Turnpike Co.*, 7 Ind., 547.) The court did not err in excluding the evidence.

4. The next assignment of error relates to the ruling of the district court in excluding certain evidence offered on the trial by Gerner. Gerner, as already stated, pleaded in defense to this action that Church & Oliver represented to him at the time he signed the contract in suit that one Whitney J. Marshall had signed a similar contract, agreeing to donate $1,000; that if he, Gerner, would sign the contract his liability would be identical with that of Marshall, except as to the amount; that, relying upon and believing such representations, he executed the contract in suit; that such representations were false and known by Church & Oliver to be false, and made by them for the purpose of deceiving him, Gerner; that, though Marshall had signed a subscription or contract like the one sued or, Church & Oliver, at the time of such signing by Marshall, had made and delivered to him a separate agreement in writing, to the effect that the subscription contract signed by Marshall should not be enforced according to its terms. On the trial Gerner put in evidence a writing, bearing date April 10, 1891, signed by Church & Oliver and delivered to Marshall. This writing was as follows:

"Lincoln, Neb., April 10, 1891.

" Whereas W. J. Marshall has subscribed on a subscription paper of even date the sum of one thousand (1,000) dollars, which sum he agrees to pay on the following condition, viz.: This amount he agrees to pay when he has sold his fifty-feet frontage on O street in Lincoln, Nebraska, commencing on Fifteenth street, same city. The subscription paper above referred to is one by Henry Oliver and Edward A. Church for the building of an opera house

on the southwest corner of P and Thirteenth streets, Lincoln, Nebraska.                              HENRY OLIVER.

"ED. A. CHURCH."

Gerner was then called as a witness for himself and asked the following questions:

Q. Who presented to you the subscription paper, which has been introduced in evidence, that you signed?

A. Oliver & Church.

Q. State what, if anything, was said to you in respect to who else had subscribed, and how much they had subscribed.

Objected to and sustained.

Q. You may state whether or not you had any conversation with Marshall in regard to making this subscription.

A. None at all.

Q. Was his name mentioned by Oliver & Church when they came to solicit your subscription?

Objected to and sustained.

Q. You may state if Whitney J. Marshall's name was mentioned to you, in the same interview at the time you signed this subscription paper, by Church & Oliver.

A. Yes, sir.

Q. What did they say to you in respect to his subscription or his having subscribed?

Objected to and sustained.

Q. Now, at the time this subscription paper was presented to you, was W. J. Marshall's name mentioned by Church & Oliver?

A. Yes, sir.

Q. Now, you may state what was said in connection with his name.

Objected to and sustained.

Q. Was that at the time you did sign this paper?

A. Yes, sir.

Q. And was it before or after you had signed it?

A. Before I signed it.

Q. In the same interview?

A. Yes, sir.

Q. Now you may state what they said.

Objected to and objection sustained.

We think the court erred in excluding this evidence. If Church & Oliver had represented to Gerner that Marshall had subscribed $1,000 towards erecting the opera house and Gerner had believed and relied on such representation and made the subscription he did, and such representation had been false, can it be doubted that such representation would have been a material one? The evidence offered tended to show that Church & Oliver represented to Gerner that Marshall had subscribed $1,000 towards building the opera house and that such sum would become due and payable at the furthest when such opera house should be completed according to the terms of the written agreement signed by Gerner; and the evidence excluded tended to show that Marshall's liability was not the same as the liability incurred by Gerner; that the subscription made by Marshall was not to be paid when the building was completed but only when he should sell a certain piece of real estate. This might never happen. In any event it left it optional with Marshall whether he should ever become liable on his subscription. In other words, this evidence tended to show that Gerner's subscription contract was procured from him by fraud. It is always competent for a party when sued upon a written contract to show by parol that he was induced to execute the contract by the fraud or material false representations of the party seeking to enforce it.

5. The final assignment of error is that Church & Oliver are not the real parties in interest in this action. On the 5th day of May, 1891, an agreement in writing was entered into between Henry Oliver and one James F. Lansing as parties of the first part and Edward A. Church as party of the second part. This agreement had reference to the opera

house when constructed, and recited that certain parties had subscribed and agreed to donate to Henry Oliver and Edward A. Church certain sums of money, and among other things contained this provision: "In consideration of this agreement the said party of the second part [Ed. A. Church] hereby assigns to party of the first part [Henry Oliver and James F. Lansing] all his right and interest in and to said subscriptions and donations, and upon the signing of this agreement he will execute such assignment upon said subscription papers." This suit was brought on the 13th day of June, 1892. Section 29 of the Code of Civil Procedure provides, in effect, that all actions must be prosecuted in the name of the real party in interest. Are Ed. A. Church and Henry Oliver the real parties in interest in this suit? In *Hoagland v. Van Etten*, 22 Neb., 681, said section 29 of the Code was construed, and it was held: "The real party in interest, under section 29 of the Code, is the person entitled to the avails of the suit." (See, also, *Grimes v. Cannell*, 23 Neb., 187; *Hoagland v. Van Etten*, 23 Neb., 462.) At the time this suit was brought Edward A. Church had no interest whatever in the subscriptions made by Gerner and others to Church & Oliver, as he had assigned all his right and interest in said subscriptions and donations to Henry Oliver and James F. Lansing, and these gentlemen, so far as the evidence shows, were entitled to sue for such donations.

It is argued that Church & Oliver are the trustees of an express trust, within the meaning of section 32 of the Code; but these subscriptions were not made to Church & Oliver as trustees, nor were the promises of the signers of the subscription papers made to Church & Oliver for the benefit of any other person. The contract of subscription recites upon its face that the signers agreed to pay to Church & Oliver, or their order, the amount subscribed. This was a promise made to them jointly; and Church, prior to the bringing of this suit, for a valuable consideration, assigned

and sold all his interest in the subscriptions.  We think, therefore, that the proper parties to bring this action, and the only parties who could bring it, were Henry Oliver and James F. Lansing, and the learned district judge was wrong in instructing the jury that Edward A. Church and Henry Oliver were the real parties in interest.  ·

The judgment is reversed and the cause remanded to the district court with instructions to permit the petition to be amended and the suit to proceed in the name of Henry Oliver and James F. Lansing as plaintiffs, on such terms as the court may prescribe.

REVERSED AND REMANDED.