BESSIE MCWILLIAMS, APPELLEE, V. WILLIAM GRIFFIN: SIDNEY R. LANG, APPELLANT.

273 N. W. 209

FILED MAY 14, 1937. No. 29931.

*Max G. Towle,* for appellant.

*Lee Basye, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

EBERLY, J.

Bessie McWilliams instituted this action against William Griffin and Sidney R. Lang, to recover for personal injuries received in an automobile accident occurring on May 4, 1935, in the city of Lincoln, at the bridge across Oak creek on North Tenth street. Defendants joined issue, and trial was had to a jury resulting in a judgment for plaintiff and against the defendants. From the order of the trial court overruling his motion for a new trial, Sidney R. Lang alone appeals.

The case on this appeal turns on the question whether the automobile involved in the accident in suit, let by Lang to Griffin, was defective, and whether the injuries for which plaintiff sues were received by her by reason of such defects, which the lessor might have discovered by reasonable inspection before letting. The defendant Lang's defense is a general denial, with which is coupled an allegation "that the injuries and damages sustained by the plaintiff, if any, were due to and the result of the carelessness, negligence and unlawful acts of the defendant William Griffin and the plaintiff herein, all of which were the proximate cause and contributed to the alleged damages to the plaintiff."

Defendant Lang is engaged in the business of letting automobiles for hire. Under his plan of doing business, he does not furnish a chauffeur. The party obtaining the car provides his own driver. It appears that on the evening of May 4, 1935, at about 8:10 p. m., defendant Griffin appeared at Lang's place of business and rented car No. 10, a Ford coach. On the delivery of this car to Griffin, he signed a printed certificate, of which the following is a copy:

"Arcade Rent-A-Ford Co. Phone B1647. Lincoln, Nebr. Date, May 4, '35. This certifies that I have this day rented from the above company, Car No. (indicated below) in good condition. I am a competent driver and operator of this make of car, and hereby agree to be responsible for said car and to return same to said company

in as good condition as when received by me, the ordinary wear and tear excepted. I have deposited $4.00 as a guarantee of good faith in keeping the terms of this contract, and agree to pay said company for the use of said car. Failure to lock steering wheel makes me responsible in case of theft. W. E. Griffin (Signature of lessee) Car No. 10, Insurance ————, Meter in ————, Time in ————, Meter out, 21345, Time out 8:10, No. Miles traveled, ————, Time ————, Amount refunded for gas, oil, etc. $————, B15502. Net $————. Don't Speed— Take No Chances—Safety First. Remember you are responsible for this car."

The automobile then received by Griffin was a 1933-V-8 Ford coach, and, as indicated above, was identified as "Car No. 10." It had been purchased by Lang in the middle of 1933, and had been used continuously since that time in his business. The record discloses that immediately prior to this transaction in suit, on April 30, 1935, Albert York had rented and driven car No. 10 five miles; on May 1, following, witness L. S. Long had rented and driven it 18 miles; on May 2, 1935, S. Seguin had rented and driven it 122 miles; on May 3, witness M. L. Lawson had rented and driven it 11 miles; and on the same day Vern Thomas had rented car No. 10 and had driven it 23 miles. So far as disclosed by the record, none of these parties complained to defendant Lang of the working of this car. The affirmative evidence of Lawson and Long is that while they were operating this car it functioned properly. Indeed, Lawson's testimony as to an occurrence on May 3, is: "Q. Do you remember how far you drove it? A. Well, I was almost to Malcolm to a farm out here and turned around and came back in. Q. How did the car drive? A. It drove all right for me. Q. Were the brakes working? A. They absolutely was, because I remember when I came in from Abe's Tavern, when I came around the curve there I was going 55 to 60, and a car came out from the road there and I had to stop to keep from hitting him. Q. Did the car shimmy? A. It did not. Q. The brakes worked all right, did they? A. They sure did."

This car No. 10, prior to being turned over to Griffin on May 4, had been inspected by witness Guild, who was an employee of Lang. He testified, with reference to car No. 10: "Q. What did you do to this particular car? A. I thoroughly inspected it, changed the oil, filled it with gas, tested the brakes up and down the aisle, inflated the tires, everything that needed to be done. Q. Was the air the same in the tires all the way round, just what it should be? A. Yes. Q. Did you know at the time that Mr. Griffin had ordered the car for the evening? A. No; I didn't know that he had ordered it. Q. Mr. Lang told you to get it ready and have it ready for the evening? A. Yes. Q. And you did that? A. Yes. Q. Was the car working all right? A. Perfect, so far as I know it was working perfect. Q. Did you take the car out and drive it around the street? A. I did, around the block."

Further, defendant Lang testified that on May 4, before it was turned over to defendant Griffin, he personally drove car No. 10 to the gas pump and filled it; that the brakes were then in good condition, and that there was nothing wrong with the accelerator, the spindles, or the steering device.

Car No. 10 was then delivered to defendant Griffin about 8:10 p. m. The record further discloses that Mr. F. H. Benton, who was Griffin's companion during the events which occurred on the evening of May 4, 1935, met Griffin at a beer tavern some time after 8:10 p. m., where Griffin was then eating. This beer tavern was located at the corner of Tenth and N streets in the city of Lincoln, and the rented car was then parked outside. Griffin, after a conference with Benton, called up the plaintiff, who testifies: "He * * * said there was another couple with him or going to be with him, a Mr. Benton and his girl friend, and he wanted to know if I would go along with them for the evening; and I said, no, I didn't think I would because I had worked late and was going to take an aspirin and lie down. but I said, 'You can call later and I will see how I feel then,' but instead of calling he (with Benton) came out

at about nine" to where plaintiff was living. The plaintiff finally consented to go along, and the "girl friend" not accepting Benton's invitation, the party of three then drove about the city of Lincoln, with Griffin at the wheel. Plaintiff further testifies: "When we got on Thirteenth street the car got in a street car track and that is the first I noticed that 'shimmy,' it was quite bad; he came to a stop button and stopped in order to get it to quit 'shimmying;' * * * I said it was awful good looking, but it doesn't seem to work so well." The party continued north to Yost's café. At this place the party drank "more than one bottle of near beer spiked with alcohol." The party then returned to the car, "rode up O street west, then started south on Tenth," and "the car did another shimmy on Tenth for almost a block before he (Griffin) could get it straightened out again." After a time the party went out on North Tenth street to "Abe's Tavern," and when they arrived at Abe's Tavern the party went in and indulged in more beer spiked with alcohol. The plaintiff testifies that after they had the beer they returned to the car and Griffin again took the wheel, the party returning to Lincoln over the same road over which they had arrived at the tavern. As to the return trip, the plaintiff says: "Well, he seemed to drive the car all right as far as I can remember; he parked all right, he got out of the parking all right; there was a lot of cars out there; he did speed up a little on the way back, but that was after we went down that small incline and, of course, there wasn't much farther to go to the turn, and Mr. Benton and I both spoke about him not speeding because the corner was close. Right then is when he tried to slow the car down, and I was watching him and he worked the brakes and foot feed and everything trying to slow the car down." Then the car struck the bridge and after that plaintiff does not remember anything. This caused the injuries plaintiff sustained. The roadway, a paved street with paving some twenty feet in width, turns sharply to the south as it approaches the bridge referred to. On the question of speed, plaintiff's testimony is, in part: "Q. Now,

do you know about how fast the automobile was traveling at the time you returned from Abe's Tavern; you have ridden in automobiles, have you? A. All my life, practically, and I wouldn't say it was going over 45 or 50. Q. About 45 or 50 miles an hour? A. Yes. * * * Q. What, if anything, did you say to the driver, the defendant Griffin, about the time you approached the curve, if anything? A. You mean the turn toward the bridge? Q. Yes? A. Well, we told him to be careful, that there was a sharp turn. Q. You told him that? A. I did. Q. And he was going about 50 miles an hour at that time? A. Well, he tried to slow the car down. Q. I asked how fast he was going? A. Yes."

However, four disinterested eyewitnesses of the accident, who were not members of this pleasure party, agree on their testimony that the car was traveling at the rate of 60 miles an hour or more as it approached the bridge; that the driver continued to feed gas until within 15 feet of the bridge, and was then apparently unable to make the turn, and crashed into the northeast corner of the bridge. All three persons of this pleasure party in the car at the time of impact occupied the front seat, with rear seat entirely empty when the accident occurred.

Plaintiff also says in her testimony, as to speed: "Q. Didn't you tell him (Griffin) if he didn't stop you would get out? A. He drove carefully until he got about half way between Abe's and that bridge. Q. Then you think the alcohol took hold? A. Then he did speed up, not much. Q. Didn't you say you wanted out of the car if he didn't stop driving so fast? A. No; I told him to be careful because we were coming to a turn and it was a short turn. Q. Didn't you say, 'If you don't quit driving so fast I will get out of the car?' A. You are misrepresenting it. Q. Wasn't he driving on the wrong side of the road? A. No; he wasn't. Q. And he wasn't driving in a reckless, careless, negligent manner? A. No; he wasn't."

Defendant Griffin testified as to the cause of the shimmy: "I would say it was caused from loose spindles or the car

being out of alignment." Further, "Q. Tell the jury what you mean by loose spindles. A. Loose spindles is where your wheels, your hub of the wheel fits on the spindle; where the wheel is worn that could cause it or the wheels being out of alignment." This conclusion, however, has for its sole foundation the fact that a shimmy occurred. None of the party, nor any one in their behalf, ever made an actual examination of the front wheels to ascertain the true facts as to the spindles being loose, or the wheels out of alignment. So also, no one testifies that a "shimmy" occurred in car No. 10 as they were approaching the Oak creek bridge just prior to the impact. Neither is Griffin's testimony entirely clear that the brakes failed at this point. Griffin testifies: "When I got within a block and a half from the corner * * * and I started breaking it, * * * the wheels did lock. * * * The car went straight ahead toward the bridge. I couldn't help myself. * * * I couldn't turn the wheels." Further, "The brakes wouldn't work after the wheels locked." Griffin further testified that he was traveling about 30 miles an hour when he collided with the northeast corner of the Oak creek bridge.

It also appears in the record, without objection of parties, that Griffin, on the night of the accident and shortly after it happened, was arrested by the city police for speeding and reckless driving. The police officer making the investigation of the accident, immediately after its occurrence, testified that the radiator of the car struck the northeast corner of the bridge almost "head-on;" and that the steel railing of the bridge "was driven through the radiator and up past the motor and through the dash so that there was about two or three feet of railing extended on through the dash into the front seat of the car."

Witness Fosbury, shop foreman for O'Shea-Rogers Motor Company, with an experience as an expert mechanic dating back to 1913, who repaired the wrecked car, examined car No. 10 the next day, and personally superintended the work of repairing it, and whose competency as an expert is not questioned, testified, in part, as to the

condition of the car: "The car had hit a post on a bridge just left of the center of the car (radiator) ; * * * the blow was just a little bit to the left although just about as close to the center as you could get it. It tore the radiator and motor and cylinder head and water pump and the hood and the cylinder block and all that stuff, it just mashed it up, mangled it up, it cut the radiator right in two; the radiator was damaged, the motor was damaged, the glass and doors, the frame, the bumper, the front spring, it really was a very bad wreck, showing a very, very hard blow. * * * Q. Tell the jury from this examination whether or not you found anything wrong at all with the mechanism or brakes on this car? A. In making an estimate of this description I would just like to explain what we do. We have to check over everything on the car because when a car is completed in our shop it has to go out and be guaranteed, and if anything isn't right about it in the eyes of the firm I was responsible. In this particular case here we checked up the rear end, the front end, tested the spindles and the brakes all the way through to know what we would have to do in the way of repairs. * * * I did this myself because I made up the estimate; none of the wheels were damaged in any way, this blow came in between the wheels; the spindles were all right, there were no unduly worn parts that we could see needed rebushing or rebuilding, anything like that; there were no bad parts there at all along that particular line, the wreck was all in the center of the chassis, rather than on the outside. Q. The brakes were all right, too? A. Yes, sir. Q. The tires were all up? A. Yes, sir. Q. Did you ever hear of what they call a car shimmying? A. Yes, sir. Q. You know what kind of an experience that is when an automobile does that? A. Certainly. Q. Sort of a vibration in the front wheels? A. Yes, sir. * * * Q. Could you find anything the matter with this Ford that would make it even possible for the wheels to lock? A. No, sir. Q. Could you find anything indicating any defective or worn parts that would cause it to refuse to turn? A. No, sir."

On the subject of the "shimmy," this witness testified, in part: "Q. What ordinarily causes that? A. There are two different types of shimmy; one is a shimmy and the other a road ramp; a car traveling from ten to twelve miles an hour will have what we call a shimmy; that is, the front wheels moving back and forth sideways. As you gain speed all that shimmy leaves and around 45 on up, depends on the condition of the car, we get what people term a shimmy, but it is really a road ramp, really an unbalance of the front wheels, causes the car to go down the street like this (indicating with hands), and makes the car shake considerably. As a rule that out balance with the wheels shows up most distinctly at 62 miles an hour. If the wheels are badly out of balance or something is badly wrong it may come in about 50 on up. As you increase the speed from 62 to 65 the unbalance leaves. Q. Isn't it true also that this is sometimes caused by a different amount of air in the two front tires? A. Yes. Q. Does the shimmy of an automobile come from the operation on a straight-a-way or can it come on a curve as well? A. As a rule when you go around a curve, particularly at high speed, you naturally throw the wheels again out of balance and the two out of balance seem to offset each other and you generally do away with road ramp going around a corner."

Plaintiff also introduced in evidence the traffic ordinance of the city of Lincoln, in force at the date of the accident. Section 517 thereof, reads as follows:

"Speed Regulated. Motor vehicles shall be driven at a rate of speed that is reasonable and proper having regard for the traffic and roadway and the condition of the street, and shall at all times be under the control of the driver. The maximum rates of speed shall be as follows: In the congested district, fifteen (15) miles per hour; on arterial streets outside of the congested district, twenty-five (25) miles per hour; on all other streets, twenty (20) miles per hour. It shall be unlawful for any person to operate a motor vehicle at a greater rate of speed than

herein set forth, or in violation of any of the provisions hereof." Appropriate penalties are provided for its violation.

We have thus quoted at length from the record testimony which, in view of the undisputed physical facts, establishes as a matter of law the character of the transaction in suit to be one wholly insufficient to sustain the judgment appealed from.

The accident occurred within the corporate limits of the city of Lincoln, on the public streets thereof. The entire transaction was within the purview of the public ordinance of that city in evidence, and its terms were applicable thereto. The transaction presented to us was a bailment, a letting of the automobile for hire by Lang to Griffin. It involved a contract of hire, partly in writing, partly oral. It contained, or at least justified, the implied inference that Griffin might use the automobile hired for the purpose of carrying other persons as passengers, either as guests, employees, joint adventurers, or otherwise. It is also to be conceded that this contract of bailment, impliedly at least, warranted that the thing bailed "is of a character and in a condition to be used as contemplated by the contract." 7 Am. & Eng. Ency. of Law (2d ed.) p. 306. See, also, *Williamson v. Phillipoff*, 66 Fla. 549, 64 So. 269; *Collette v. Page*, 44 R. I. 26, 114 Atl. 136.

The contract must also be deemed to render applicable the following rule: "There is on the part of the hirer an implied obligation not only to use the thing hired with due care and moderation, but also not to apply it to any other use than that for which it was hired; and if the hirer of an animal or other chattel, without the consent of the letter, uses it for a different purpose or in a different manner from that contemplated by the contract of hiring, or in any other way transcends the contract, and the thing hired is lost, destroyed, or injured while being so used, the hirer is liable absolutely, although without fault." 7 Am. & Eng. Ency. of Law (2d ed.) p. 312.

It thus appears in the present case that the terms and

obligations of this contract of hiring are determinative of the liabilities of the hirer. In this connection, it is settled that the laws which subsist at the time of making a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated therein. This principle embraces alike those which affect its validity, construction, discharge, and enforcement. 13 C. J. 560; 6 R. C. L. 855, sec. 243; *Von Hoffman v. City of Quincy,* 4 Wall. (U. S.) 535; *Walker v. Whitehead,* 16 Wall. (U. S.) 314.

A contract is not merely what the parties expressly stipulate. It is that also which the existing laws of the county where the contract is made annex to it at the time when it was formed. *Ogden v. Saunders,* 12 Wheat. (U. S.) 213; *Bronson v. Kinzie,* 1 How. (U. S.) *311. See, also, *Farmers & Merchants Bank v. Federal Reserve Bank,* 262 U. S. 649, 43 Sup. Ct. Rep. 651; *Fidelity State Bank v. North Fork Highway District,* 35 Idaho, 797, 209 Pac. 449; *State v. Klein,* 63 N. Dak. 514, 249 N. W. 118; *Gregg School Township v. Hinshaw,* 76 Ind. App. 503, 132 N. E. 586; *Maxwell v. Eddy Paper Co.,* 232 Mich. 356, 205 N. W. 111; *Anderson v. Miller Scrap Iron Co.,* 169 Wis. 106, 170 N. W. 275.

Every contract is made with reference to, and subject to, existing law, and every law affecting the contract is read into and becomes a part of the contract. This is true between individuals dealing between themselves by contract, and it is also true between individuals and the government. *Cobbs v. Home Ins. Co. of New York,* 18 Ala. App. 206, 91 So. 627; *People v. Levitt,* 145 Misc. 621, 260 N. Y. Supp. 458; *Walker v. Whitehead,* 16 Wall. (U. S.) 314; *City of Henderson v. Henderson Traction Co.,* 200 Ky. 183, 254 S. W. 332; 13 C. J. 560.

The foregoing rules were early adopted, and have been consistently applied and followed, in this jurisdiction. *Watkins & Co. v. Kobiela,* 84 Neb. 422, 121 N. W. 448; *American Surety Co. v. School District,* 117 Neb. 6, 219 N. W. 583.

Furthermore, this court is committed to the doctrine that city ordinances come within the rules just stated. *Gerner v. Church,* 43 Neb. 690, 702, 62 N. W. 51; 13 C. J. 561. Thus, in *Gerner v. Church, supra,* in an action upon a subscription contract, after a discussion of the authorities, we held: "These authorities recognize the doctrine that the ordinances of a city are within the rule that the law of the place where the contract is made enters into and becomes a part of such contract when the subject-matter of the contract is within the legislative jurisdiction of the city council. If the ordinances of the city of Lincoln had prohibited the erection of a wooden building where the opera house is situate, and the contract between Gerner and Church & Oliver had expressly provided that the latter should erect a wooden theatre on the site now occupied by the opera house, it certainly cannot be questioned that neither of the parties to such contract could have enforced it against the other. The contract in suit between the parties does not by its terms require Church & Oliver to erect a building of the character prohibited by the ordinances of the city; but the ordinances of the city were as much a part of Gerner's contract with Church & Oliver as if they had been written therein. In other words, the contract should be construed as though it read that Gerner would pay to Church & Oliver $200 when they erected an opera house covering a space of ground 100 x 142 feet on the site named, in accordance with the ordinances of the city of Lincoln regulating the construction of such buildings." This pronouncement is in line with the weight of authority. *Wright v. Computing Scale Co.,* 47 Wash. 107, 91 Pac. 571; *Citizens Ins. Co. v. Barnes,* 98 Fla. 933, 124 So. 722; *Dollman v. Pauley,* 202 Ind. 387, 174 N. E. 729; *Kansas City to use of Kansas City Hydraulic Press Brick Co. v. Youmans,* 213 Mo. 151, 112 S. W. 225; *Equitable Bldg. & Loan Ass'n v. Wolfangle,* 111 Cal. App. 119, 295 Pac. 388; *Briody v. De Kimpe,* 91 N. J. Law, 206, 102 Atl. 688; *City of Milwaukee v. Raulf,* 164 Wis. 172, 159 N. W. 819.

In the instant case the contract of hiring was made in

Lincoln, Nebraska, by residents thereof, and concerned "car No. 10" then located therein, and delivered to the hirer, under the terms of the agreement, within the limits of said city for immediate use, and for return on the completing of the use contracted for to the garage from which delivery was made. It necessarily follows that a portion of the use contracted for and in the contemplation of the parties would take place within the corporate limits of the city of Lincoln. At least as to that use the doctrine announced in *Gerner v. Church, supra,* would be applicable and determinative of all rights involved in the contract of hiring. This contract of hiring would thereby be construed as though it read, by agreement of parties, "car No. 10" when operated under this contract of May 4, 1935, within the corporate limits of the city of Lincoln, should never be driven in excess of a maximum speed, as follows: "In the congested district, fifteen (15) miles per hour; on arterial streets outside of the congested district, twenty-five (25) miles per hour; on all other streets, twenty (20) miles per hour."

Appellee cites as controlling, and relies on, *Milestone System v. Gasior,* 160 Md. 131, 152 Atl. 810, and similar precedents. We quote from the *Gasior* case, viz.: "If one engage in the business of letting, for a reward, to the public automobiles to be used and driven by the hirer, with or without guests or passengers, according to his pleasure, the success of the enterprise depends upon the immediate command of automobiles for instant, safe, and satisfactory use while hired; and there is so much danger involved to the class which hires, and to those who are the occupants of the automobiles they have rented, if the automobiles be not in reasonably safe condition for the normal purposes to which they may forthwith be put while let, that the law, notwithstanding some dissent, casts upon the letters of the use of automobiles the affirmative duty to know that the automobile rented is in fit condition for the purposes for which it is to be at once used."

Applied to the instant case, the words, "for the normal

purposes to which they may forthwith be put while let," limit, within the city of Lincoln, the use of the rented automobile to a speed of not to exceed 25 miles an hour. Immediately preceding the accident in suit, car No. 10 was being driven over the streets of Lincoln, according to plaintiff's own testimony, at a speed of from 45 to 50 miles an hour, and the slowest speed, even at the instant of impact with the Oak creek bridge, is stated by plaintiff's witness as "30 miles an hour." These circumstances, in view of all the evidence in the record, negative liability on part of defendant Lang.

As bailor, under the facts in this case, he is not liable for injuries to a third person by the bailee's negligent use of the property bailed. *Fisher v. Fletcher,* 191 Ind. 529, 133 N. E. 834; *Robinson v. Bruce Rent-A-Ford Co.,* 205 Ia. 261, 215 N. W. 724; *Hartley v. Miller,* 165 Mich. 115, 130 N. W. 336; *Eklof v. Waterston,* 132 Or. 479, 285 Pac. 201.

There is no evidence in the record that this automobile was defective so as to be dangerous to the public, or to the occupants thereof, when it was being operated at a lawful speed within the limits of the contract. In fact, the following evidence introduced on behalf of plaintiff is uncontroverted on that subject: "Q. What did you do,—how fast,—first, I will ask you if you drove up Eleventh street first? A. Yes. Q. After you left the place where Mrs. McWilliams lived? A. Yes, sir. Q. And how fast did you drive along in there? A. Twenty—twenty-five miles an hour. Q. And did you,—was there anything that called your attention,—how did the car operate along there? A. It worked all right along there." The evidence is also without dispute that, when this automobile was driven north on Tenth street in a careful manner over the portion of the street where later the accident in suit occurred, no accident happened, and no structural or mechanical defect was developed. It was only on the return trip over the same road, made at a speed far in excess of that contemplated by the contract of hiring, that it is claimed that

the wheels locked and thereafter the brakes failed to work. There is no evidence in the record from which the conclusion may be drawn that car No. 10, when driven at the rate of 25 miles an hour, was "defective" in the sense of being dangerous to the public or to the occupants thereof. *Carroll v. Minneapolis Drive Yourself System,* 206 Wis. 287, 239 N. W. 501.

It is also to be noted that plaintiff maintains this action strictly in the capacity of a "guest." The statute defines "guest" as any passenger or person riding in a motor vehicle as a guest, or by invitation, or not for hire. Section 39-1129, Comp. St. Supp. 1933, provides: "The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest * * * unless such damage is caused by the driver of said motor vehicle being under the influence of intoxicating liquor or because of the gross negligence of the owner or operator." Recovery is not sought in this case as against Lang on the basis of Griffin being under the influence of intoxicating liquor. In *Heesaker v. Bosted,* 131 Neb. 42, 267 N. W. 177, where the capacities of owner of the car and operator thereof were united in a single individual, and the defect charged was the presence of a defective boot around a defective tire, which was charged to be the cause of a blow-out which occasioned the accident, this court, in effect, adjudged the case within the protection of the guest statute so as to require proof of gross negligence to sustain recovery. In the present case, Lang is the owner and Griffin is the operator of the car, and the question here presented is whether in this case, under this statute, the evidence must establish gross negligence on part of Lang to support the judgment entered against him in this case. A careful consideration of all the evidence in the record leads inevitably to the conclusion that gross negligence is not established. But this question may not be deemed necessary to a proper disposition of the case. Even if we assume that the guest statute is inapplicable, and that the payment óf the consideration of the contract of

hire of this automobile by Griffin be deemed to be made as to Lang in part in behalf of McWilliams, and thus to remove the transaction from the provisions of the statute referred to, the plaintiff would thereby become but a sharer of the permissive use obtained by virtue of the agreement entered into with Lang, subject to its limitations as well as entitled to a performance of its obligations. As we have seen, the evidence in the record as an entirety, considered in the light most favorable to plaintiff, wholly fails to establish any default on the part of Lang in the performance of this contract of hiring, in view of the limitations of the traffic ordinance necessarily implied.

It follows that the judgment entered by the district court in this case against defendant Lang is not supported by the evidence in the record, and is erroneous. Therefore, such judgment is reversed, and as to defendant Lang the action is dismissed.

REVERSED AND DISMISSED.