HAROLD W. HERMAN, APPELLEE, v. MIDLAND AG SERVICE, INC., A NEBRASKA CORPORATION, APPELLANT.

264 N. W. 2d 161

Filed March 22, 1978. No. 41275.

Maupin, Dent, Kay, Satterfield, Girard & Scritsmier, Dale A. Romatzke, and Gary D. Byrne, for appellant.

Richard H. Williams of Barney & Carter, and Nelson, Harding, Yeutter, Leonard & Tate, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, and BRODKEY, JJ.

CLINTON, J.

This is an action by the plaintiff, Herman, a farmer, against the defendant, Midland Ag Service, Inc., a fertilizer supplier, for personal injuries sustained by Herman on his farm while in the process of transferring anhydrous ammonia from a nurse tank furnished by the defendants to an applicator tank. Plaintiff sought recovery upon three theories: (1) Breach of implied warranty by defendant in furnishing a valve on the transfer hose on the nurse tank which was not reasonably fit for its purpose; (2) negligence; and (3) strict liability in tort. The

trial court submitted the cause to the jury on the theories of negligence and a breach of implied warranty of fitness, and as to the negligence theory, submitted the defendant's claim of contributory negligence and assumption of risk on the part of the plaintiff. The jury returned a verdict for the plaintiff. Because of the form of the verdict, it is not possible to determine whether the verdict was founded upon the defendant's alleged negligence, or upon breach of warranty, or both.

On appeal to this court the defendant makes numerous assignments of error and those which have been both assigned and argued in the brief are consolidated by us to the following: (1) The trial court erred in failing to instruct the jury as to the specific acts of contributory negligence pled by the defendant and which were supported by the evidence. (2) The evidence of the plaintiff to prove circumstantially and by alleged scientific experiments that the plaintiff's injuries were proximately caused either by the negligence of the defendant, or by a breach of warranty by the defendant, was insufficient to support the verdict. (3) The court erred in permitting the plaintiff to introduce the results of experiments as to how the accident and injuries might have occurred, when the experiments were based upon assumptions of which there was no proof. (4) The court erred in giving instruction No. 17, dealing with the standard of care exercisable by one who furnishes a dangerous substance because the instructions set forth, not just a standard of care of the highest degree, but also one of "strict accountability." (5) The court erred in submitting to the jury the proposition that plaintiff could recover upon the theory of an implied warranty of fitness for a particular purpose. (6) The court erred in refusing to give the defendant's requested instructions Nos. 2, 9, and 11 pertaining to the duty of the bailor of a product not manufactured by him to inspect before entrust-

ing to the bailee. (7) The evidence was insufficient to sustain the verdict because the plaintiff failed to prove that an inspection by the bailor would have revealed any defect. (8) The evidence was insufficient to sustain the verdict because the evidence failed to prove that the bailee relied upon the bailor's judgment in the selection of the product, to wit, the alleged defective valve. (9) The court erred in failing to instruct that an assumption of risk is a defense in an action for breach of warranty. (10) The court erred in giving instructions Nos. 2 and 18 and in refusing defendant's requested instruction No. 11, which instructions relate to the principle that there is no duty to warn of a known danger. (11) The court erred in refusing to direct a verdict for the defendant on the ground the evidence showed that the defendant was guilty of contributory negligence as a matter of law. (12) The court erred in refusing to permit evidence that the same equipment, to wit, the valve which allegedly caused the accident and injuries in this case, was used by others both shortly before and shortly after the accident without incident or modification in the equipment. For reasons hereinafter explained, we reverse and remand for a new trial.

It is admitted that on June 8, 1974, the defendant, pursuant to a purchase order for fertilizer, delivered to the plaintiff's farm a nurse tank filled with approximately 1,000 gallons of anhydrous ammonia. The nurse tank is equipped with a hose and nozzle by means of which the transfer of the fertilizer in the nurse tank to the applicator tank is made. On the day above mentioned, while the plaintiff was in the initial steps of the process of making the transfer, the valve on the nurse tank hose, in some manner not exlained by direct evidence, opened before the plaintiff had made the necessary attachment to the receiving valve on the applicator tank and, as a consequence, he suffered burns to the face and eyes which resulted in serious permanent injury.

As to the theory of warranty, the trial court, by its instructions, submitted to the jury the issue of whether the defendant furnished to the plaintiff "a transfer hose and valve, which valve was not reasonably fit for the use intended, that is, the transfer of anhydrous ammonia from the nurse tank to an applicator tank in a reasonable manner." As to the theory founded on negligence, the court submitted the following allegations of negligence: (1) Failure to warn the plaintiff by a plain and visible warning on the nurse tank, as required by certain regulations, of the dangerous propensities of anhydrous ammonia. (2) The failure to furnish to the plaintiff, for use in making the transfer, a full face mask or goggles as called for by certain regulations. (3) The failure to provide an adequately tightened valve. (4) The failure to instruct the plaintiff in safety procedures.

As to the negligence theory, the court submitted to the jury the defendant's pleaded defenses only in the following form: "a. Plaintiff was himself negligent in failing to exercise due care and proper caution in attempting to transfer anhydrous ammonia from a nurse tank to an applicator tank. . . . b. Plaintiff assumed the risk of his own injury." The trial court did not instruct the jury as to any specific claimed acts of contributory negligence, although the defendant had pleaded, among others, that the plaintiff was negligent in the following particulars: "4. In holding onto the wheel on the valve on the end of the nurse tank hose . . . when in the process of attempting to attach the nurse tank hose to the applicator tank. . . . 5. In opening the valve on the end of the nurse tank hose . . . when in the process of attempting to attach the nurse tank hose to the applicator tank."

Before determining the merit of the assignments of error it will be helpful to summarize certain portions of the evidence. This summarization will,

where necessary, later be supplemented as we discuss the particular assignments.

The evidence shows that shortly before noon on the day of the accident, one of the employees of the defendant had, at the plaintiff's request, delivered to the plaintiff's farm the nurse tank in question. The employee parked the nurse tank in the farmyard and left it. Whether he left it beside the applicator tank or whether plaintiff later moved the applicator tank into position by the nurse tank is disputed in the evidence. In any event, it is admitted that no special instructions were given by the employee to plaintiff at that time.

When a nurse tank is delivered, a valve at the tank end of the hose is closed as is the valve [the one here claimed to be inadequately tightened] at the end of the hose which is to be attached to the reciprocal valve on the applicator tank. Two employees of the defendant, one of whom filled the nurse tank on the day in question, testified that the valve on the hose was closed tight after the tank was filled and that it was not leaking. When the process of filling the nurse tank from the storage tank at the supplier's place of business is completed, the hose, although closed off from the nurse tank by a valve on the nurse tank itself, contains anhydrous ammonia under pressure and it is in this condition when delivered to the user.

The apparent procedure for making the transfer of the fertilizer from the nurse tank to the applicator tank is as follows: The hose is removed from its place on the nurse tank, a dust cap on the applicator tank valve is removed and the valve at the end of the hose is attached to the valve on the applicator tank by means of a threaded collar. Then the various valves are opened in the proper order and the pressure of the anhydrous ammonia in the nurse tank then forces the anhydrous ammonia into the empty, or partially empty, applicator tank.

When the accident occurred, Herman had removed the hose from the nurse tank. He testified that when he removed the hose, the valve thereon was not leaking. He did not, however, check it for tightness and never had checked on any previous occasion. He then pulled the hose to the applicator tank, held the hose in his left hand, and with his right hand removed the dust cap on the applicator valve. He had proceeded to the point where he was about to attach the collar on the hose valve to the valve on the applicator tank when there was a strong burst of ammonia covering his face and clothes. In response to this question on cross-examination: "Q. Would it be a fair statement to say that you honestly don't know and can't say for sure how the accident happened on June 8th, 1974?" he responded, "I'd have to say yes, that I don't know exactly what happened. No."

As admissions against interest, two prior statements of plaintiff were introduced. The first was from a deposition. The substance of that statement was that the accident occurred just as plaintiff was about to screw the collar of the hose valve to the receiving threads on the valve of the applicator tank and at a time when the collar was about a "quarter" [inch from?] or when it was about to touch the other valve. The evidence shows that the part of the valve on the applicator tank, which receives the hose valve, is a few inches above the top of the tank and projects upward at an angle of 45 degrees from the plane formed by the center top of the applicator tank. When the valve collar is in the position described in the above admission, the nozzle of the hose valve would be directed toward the tank and not toward plaintiff's face. It can also be inferred that when the collar is in the position described by plaintiff, the valve wheel would not be in contact with the surface of the applicator tank.

The second admission against interest came from

testimony in the cross-examination of an expert witness, Schnieder, who conducted the experiments which will later be described. About a year prior to the time Schnieder was retained by plaintiff as an expert witness, Schnieder, in his capacity as an instructor and gatherer of statistics on farm safety, having heard of plaintiff's accident, came to the farm to interview the plaintiff. The witness was, on that occasion, told by plaintiff that when the accident happened, plaintiff had his hand on the valve and the valve opened, that at that moment the open end of the valve was facing up, and the ammonia came out and struck him in the face.

Immediately following the accident plaintiff washed his face and eyes with water from a hose and tank which were on the nurse tank as first aid equipment. He also summoned help and a rescue squad arrived within minutes. One of the members of this squad, a propane dealer, somewhat familiar with valves and ammonia, checked and found that all valves were then closed. The day of the accident, plaintiff's son-in-law transferred some anhydrous ammonia from the nurse tank to the applicator tank without incident. The valve was closed when he picked it up and he found nothing wrong with it. Plaintiff testified that for a short time while he was administering first aid to himself he heard hissing as though ammonia were leaking from the nozzle. The first person present after the accident testified he touched nothing. The evidence, except for the possible inference that plaintiff, himself, closed it, does not explain how the valve became closed after the ammonia burst occurred.

Plaintiff had been buying anhydrous ammonia from the defendant for a period of several years and had used the same product regularly since about 1957, in quantities varying from 5 to 20 tanks annually. During this period of time he always made the transfers between the tanks himself. At no time had

he used goggles while doing so. In 1967, he had worked parttime for an anhydrous ammonia dealer for a period of several weeks and among his duties was the filling of nurse tanks from the storage tanks. Before the accident he knew that when the ammonia was delivered the hose contained ammonia under pressure. He knew that it was a dangerous substance and that it would burn the flesh.

It is undisputed that, although required by state regulations enacted pursuant to statute, neither goggles nor a full face mask were furnished with the nurse tank by the supplier. It is undisputed that the only warning printed upon the nurse tank were the words, "Caution Ammonia." The tank bore no printed instructions or cautions as to methods to be used in handling ammonia, although such were required by regulation. There was admitted into evidence the Operational Safety Manual for Anhydrous Ammonia, issued by the Agricultural Ammonia Institute, which contained private safety regulations. This manual recommended, among other things, that since safety in the field is primarily in the hands of the applicator: "Every effort should therefore be exerted by the Anhydrous Ammonia distributor to see that he is thoroughly trained in safe handling practices and has safe equipment. When a man has not been handling ammonia for a time, re-instructing in safe techniques is in order. Applicator men should particularly be instructed in the items under Section III-A." Among the admonitions in section III-A are the following: "6. Pick up a hose by the valve body or coupling, never by the valve handwheel. . . . 12. Stand on the upwind side of ammonia transfer operation. . . . 13. Always wear tight fitting safety goggles or a full-face shield and protective gloves made of rubber or other material impervious to anhydrous ammonia when transferring ammonia."

As a part of his case the plaintiff, over objection of

the defendant, was permitted to introduce the results of certain experiments. After the accident the plaintiff "reenacted" a number of times, and caused to be recorded on motion picture film, a portion of the process by which the transfer is made. The reenactments consisted of climbing to the frame of the applicator vehicle with the hose, including the valve, in hand and moving it toward the valve on the applicator to which it was to be attached. These motion pictures indicate that plaintiff, during some of the reenactments, dragged the valve across the surface of the tank in such a manner that the handwheel came in contact with the tank's surface. It cannot be observed in these films that the handwheel and stem did in fact rotate on these occasions. Plaintiff did not testify that he had, at the time the accident occurred, permitted the valve wheel to come into contact with the surface of the tank. Plaintiff did not testify that the valve had at any time struck anything, nor that he had dropped it. At trial plaintiff testified that he had not at any time taken hold of the valve by its handwheel.

The second set of experiments was performed by the witness Schnieder and some of these experiments were also recorded on film and shown to the jury. The apparent purpose of these experiments was to show how the valve might have opened without Herman having his hand upon the handwheel. Schnieder, previous to the experiments, dismantled the valve and examined it. It was found not to be defective in any respect. He discovered, however, that by loosening the packing nut and by closing the valve only to what he described as "finger tight" (a degree of tightness requiring, as measured with a torque gauge, only 5 inch pounds of torque to open the valve), the valve would sometimes open if dropped a few inches to the pavement, or if the valve handle were dragged along a surface such as that of the applicator tank. For purposes of demon-

strating these results on film, talc was placed in the valve and the hose was pressurized with air to approximately the same pressure as when filled with anhydrous ammonia and then the experiments were repeated and filmed. On some occasions the talc could be observed to discharge through the nozzle. If the packing nut was tightened and the valve stem closed to a degree described by the witness as "snug," it would take about 30 inch pounds of torque to open the valve, and if it were "jammed tight," it would require about 55 inch pounds of torque to open. These various degrees of tightness of the valve stem were all achieved by tightening by hand. Schnieder testified that the effect of loosening the packing nut was to lessen the pressure of the packing on the valve stem and make it easier to open. There was no evidence to indicate by measurement the degree of tightness of the valve stem at the time of the accident, except the direct testimony of the defendant's employees that they closed the valves as tight as could be done by hand pressure. Inferentially, this would mean that about 55 inch pounds of torque would be required to open the valve. There was no direct evidence of any kind as to the tightness of the packing nut when the accident occurred.

It is evident that at the time of the accident the valve opened, either because plaintiff took hold of the valve wheel when moving the hose toward the valve on the applicator tank, or it was in fact somewhat loose and the valve opened by coming in contact with some surface in the manner shown by the experiment. The foundation for the experiments then clearly depended upon the truth of plaintiff's testimony at trial that he did not at any time handle the hose by taking hold of the valve stem wheel. No instruction was given or requested which would focus the jury's attention upon that issue in determining the weight and credibility to be given the results of the "reenactment" and Schnieder's experiments.

We now consider the errors assigned in the order in which we numbered them.

The trial court, in its instruction relating to the plaintiff's possible contributory negligence, referred only to the alleged failure to exercise due care and did not submit to the jury any specific allegations of contributory negligence as pled by the defendant and as to which there was supporting evidence. We have many times said that it is the duty of the trial court, without request, to submit to and properly instruct the jury on all material issues presented by the pleadings and supported by the evidence. Ripp v. Riesland, 176 Neb. 233, 125 N. W. 2d 699; Pool v. Romatzke, 177 Neb. 870, 131 N. W. 2d 593. This principle, of course, applies to claims of contributory negligence. In the last-cited case we said: "Nowhere in the instructions was the jury told which acts of the plaintiff the defendant considered to be negligent. Nor was the jury in any way apprised of defendant's theory of defense as detailed in his answer. . . . 'It is the uniform and proper practice in this state that where specific acts of negligence are charged and supported by the evidence, the trial court instructs as to the specific acts so alleged and supported. The failure to do so, whether or not requested to do so, is error.' "

We have already pointed out in our summary of the pleadings and evidence the two items of claimed contributory negligence which found support in the proof, i.e., that the plaintiff held onto the handwheel of the valve when he attempted to attach the hose to the applicator tank, and in opening the valve when in the process of attempting to make the attachment. That one or the other of these alleged acts of plaintiff caused the discharge of ammonia may be inferred from: (1) Testimony of defendant's witnesses that the valve was closed as tight as it could be by hand. (2) Plaintiff's evidence that even if tight, the valve could open if the valve wheel was

used to move the pressurized hose. (3) Plaintiff's admission that he did not know how the accident happened. (4) The evidence supported the conclusion that the release of the blast of anhydrous ammonia could be accounted for only by the occurrence of one or the other of the alternatives earlier mentioned. (5) Defendant's evidence that the length of the hose and distance between the two tanks would require some bending and pulling on the hose. (6) Plaintiff's admission to Schnieder that "he had it [the valve] in his hand and that it had opened." (7) Evidence that the valve was closed when the member of the rescue squad checked it immediately after the accident and the inference that plaintiff must have been the one who closed it. (8) Plaintiff's own evidence on standard of care admonished against handling the hose by the valve wheel. The trial court having erred in failing to instruct on pleaded issues supported by proof, such failure was prejudicial error and retrial is required.

Assignments (2) and (3) are related and we discuss them together. The defendant relies upon the proposition that to prove proximate cause, i.e., in this case that the packing nut was loose, that the valve was closed only finger tight, and that the valve opened when its handle came into contact with the tank's surface, the circumstances adduced must render the existence of the inferred facts reasonably probable, proof of mere possibility is insufficient, and that the evidence proves only a mere possibility. Defendant cites: Pendleton Woolen Mills v. Vending Associates, Inc., 195 Neb. 46, 237 N. W. 2d 99; the dissent of Judge Boslaugh in Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601; and Parham v. Dell Rapids Township in Minnehaha County, 80 S. D. 281, 122 N. W. 2d 548.

In the Pendleton case damage resulted when an automatic valve on a soft drink dispensing machine failed to close. In that case there was a complete

absence of evidence to show what caused the valve to remain open and of evidence which could lead to an inference that prior inspections would have prevented failure. In the South Dakota case the plaintiff was injured when his motor vehicle left the highway and crashed into a pole. This was an action against the defendant for improperly maintained highways. The plaintiff was unable to relate what had happened except that the highway contained chuckholes. The plaintiff's theory was that he hit a chuckhole and this caused him to strike his head on the ceiling of the vehicle which rendered him unconscious and caused loss of control. The Supreme Court of South Dakota held the evidence was insufficient as other possibilities as to cause were equally probable. In Kohler the plaintiff relied upon experimental evidence, as in this case. In Kohler there was extraneous expert opinion evidence to establish that a gear in the steering mechanism in an automobile was defective or broken when it left the factory, and that the gear could not have been broken as a result of the accident itself, because other parts would have given way first and they did not. The results of an experiment were then introduced to show that the broken gear could have caused both the steering jam and the accident. Kohler presented a much stronger case than the one before us. There the condition (broken gear) was established by extraneous evidence. The purpose of the following experiment was to show only that the broken gear could have caused the accident. In the case now before us the situation is different and unusual in that the purpose of the experiments was not only to establish possible causation, but also as substantive evidence of the conditions, to wit, looseness of the valve.

This court has said that when a party desires to introduce evidence of an experiment made outside of court, he should first show the similarity of the con-

ditions to those which were present when the occurrence in controversy occurred, and that where conditions are so dissimilar that the results of the experiment are likely to mislead or confuse the jury, they should not be admitted. Franks v. Jirdon, 146 Neb. 585, 20 N. W. 2d 597. The Nebraska Evidence Rules, recently enacted, do not contain any provision directly governing the use of the results of experiments as applied to the situation before us. However, it seems to us that sections 27-703 and 27-705, R. R. S. 1943, pertaining to expert opinion and disclosure of the bases therefore, as limited by section 27-403, R. R. S. 1943, pertaining to the exclusion of evidence if its probative value might mislead the jury, etc., are applicable by analogy. The discussion and analyses appearing in "The Nebraska Rules of Evidence, 1975," N. C. L. Ed., Inc., § 7, p. 11, seem pertinent and are as follows: "The one open question in this analysis is that while Rule 705 provides that the underlying basis need not be brought out before the expert gives his opinion, it is silent as to whether the direct examiner can bring it out when all or part of that basis is otherwise inadmissible. If allowed to do so, the opinion, of course, would be substantive evidence while the basis could be admitted not as substantive evidence but only on the issue of the credibility of the expert's opinion. As such, it would be *excludable only when the probative value to the issue of credibility was outweighed by the dangers enumerated in Rule 403.* While the piece of inadmissible evidence would not get in as substantive evidence under this analysis, the expert's opinion might serve the same purpose in terms of burden of proof requirements. Additionally, the attorney may be able to get it before the jury, though for a limited purpose." (Emphasis supplied.) A "piece of evidence offered may be relevant [and probative] only if some other fact is true." The Nebraska Rules of Evidence, *supra*, § 4, p. 4.

As earlier pointed out, plaintiff testified at trial that he did not maneuver the hose by using the valve wheel. If that testimony be true, then the valve opened in some other fashion and the Schnieder experiments were competent for the purpose of establishing other conditions under which it might open. The foundation for the experiment depended upon the credibility of Herman's denial that he held or moved the hose by having his hand upon the valve wheel. Despite the denial, the evidence was such as to permit the jury to find that he had in fact moved the hose by the valve wheel, and that this was the proximate cause of the accident and his injuries. Absent the denial, we believe the circumstantial evidence rule and section 27-403, R. R. S. 1943, support the defendant's contention that evidence of the experiment would be inadmissible. We think, therefore, that since, for reasons previously stated, the case must in any event be retried, that upon retrial the jury should be instructed that if it disbelieves plaintiff's denial, then it should not give any weight to the results of the Schnieder experiments or plaintiff's reenactment.

The trial court gave the jury the following instruction: "You are instructed that a supplier of a product who deals with a dangerous substance is held to strict accountability and owes the highest degree of care to prevent injury from the use of that product." The defendant complains that the use of the words "held to strict accountability" imposes a higher degree of care than the legal standard and was therefore erroneous in that it, in effect, imposed strict liability upon the defendant. We believe the words objected to overstate the standard of care applicable in this case, and could mislead the jury into believing that the defendant was in fact an insurer of the plaintiff's safety. The words "held to strict accountability" have not been used in any instruction which has received approval by this court in any case com-

parable to the one before us, nor in any other type of case so far as we can tell.

We discuss the cases cited and relied upon by the plaintiff in support of the instruction. In Rasmussen v. Benson, 133 Neb. 449, 275 N. W. 674, the plaintiff sold as cattle feed bran which had been prepared for use as grasshopper poison. In that case the trial court gave the following instruction which we apparently approved: "The court, after defining negligence in instruction No. 3, imposed a duty on the defendant in this language: 'And if the defendant at the time of the sale knew, or in the exercise of proper care should have known, that he had poisonous bran and that it was, or was likely to be, in the articles offered at his sale and to be so assembled or put out by himself or by others assisting him in preparing for the sale, then it was his duty to exercise a high degree of care to see that prospective purchasers were properly notified or warned of the dangerous character of the bran.' " This court then went into a long dissertation on liability and quoted numerous authorities, including the following from 49 C. J. 1045: " 'All persons who deal with deadly poisons or noxious and dangerous substances are held to strict accountability, and the highest degree of care must be used to prevent injury. . . .' " We then significantly pointed out that the plaintiff was totally ignorant of and had no reason at all to know of the poisonous nature of the substance delivered to him. He had purchased cattle feed. This court thereupon affirmed the verdict for the plaintiff.

In Colvin v. Powell & Co., Inc., 163 Neb. 112, 77 N. W. 2d 900, the defendant sold barrels containing a residue of a deadly poison, parathion, for use in storing backstrap molasses which was to be used as cattle feed, and this court, in discussing liability, again used the above quotation from Corpus Juris. Again, in that case, the defendant did not know or have any reason to suspect that there was a poisonous residue

in the barrels which had been sold to him as unused barrels. The defendant was held liable. In both of the above cases we would now hold the defendant liable under the standards applicable to strict liability in tort. Kohler v. Ford Motor Co., *supra*. The same would seem to be true in Rose v. Buffalo Air Service, 170 Neb. 806, 104 N. W. 2d 431, where an aerial sprayer used a spray containing 2,4-D and damaged a crop of sugar beets.

None of the three above cases is like the one at hand. Here the plaintiff knew the dangerous nature of the substance he was dealing with. The defendant owed him the "highest" degree of care, but was not "strictly accountable." See, also, Darnell v. Panhandle Coop. Assn., 175 Neb. 40, 120 N. W. 2d 278. The instruction given was proper, except for the words complained of, and they should be omitted if such an instruction is again given.

Assignments of error which we have numbered (5) through (9) are logically interrelated and will be discussed together.

The plaintiff's first theory of recovery was that the defendant breached the implied warranty of fitness imposed upon a seller by the provisions of section 2-315 of the Uniform Commercial Code. This aspect of the case has not been adequately briefed by either of the parties although it is quite clear from the defendant's tendered instructions, and its argument with reference thereto, that it considered its duties, insofar as the nurse tank, hose, and valve are concerned, solely those of a bailor or supplier to the plaintiff of a product for use in the defendant's business and not those imposed upon a seller by virtue of the provisions of section 2-315, U. C. C.

The plaintiff, on the other hand, assumes without citation of authority other than section 2-315, U. C. C., that that section applies to a supplier of a product under bailment as well as to a seller.

It is undisputed that the defendant sold only the

anhydrous ammonia. It furnished to the plaintiff the nurse tank and its appurtenances, including the allegedly untightened valve, for the purpose of dispensing the fertilizer. Section 2-315, U. C. C., by its literal terms, applies to sales. Here the alleged defect is not in the goods sold, but in the chattel supplied to hold and dispense the goods.

The question therefore is, should the warranty of section 2-315, U. C. C., be extended by interpretation to include cases where there is both a sale of goods and the concomitant and necessary supplying of a chattel container, or should there rise such a warranty independently of section 2-315, U. C. C.

As noted, the literal language of section 2-315, U. C. C., includes only goods which are the subject of a sale. The commentary to section 2-313, U. C. C., however, is significant and we quote: "2. Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely a supplying of containers under a contract for the sale of their contents."

We seem long ago to have adopted the principle that implied warranties of fitness may arise out of a contract of bailment. In McWilliams v. Griffin, 132 Neb. 753, 273 N. W. 209, an action for personal injuries allegedly arising from the existence of defective brakes on a hired motor vehicle, we said: "It is also to be conceded that this contract of bailment, impliedly at least, warranted that the thing bailed 'is of a character and in a condition to be used as contemplated by the contract.' 7 Am. & Eng. Ency.

of Law (2d ed.) p. 306. See, also, Williamson v. Phillipoff, 66 Fla. 549, 64 So. 269; Collette v. Page, 44 R. I. 26, 114 Atl. 136.''

We can discern no substantive difference, so far as implied warranties of fitness of a chattel are concerned, between the sale of goods and a container holding them, and the sale of goods accompanied by a bailment of the container. The practical consequences of any defect in the container are identical. The general rule seems to be that a bailor impliedly warrants the reasonable suitability of the bailed chattel for the bailee's known and intended use of it. 63 Am. Jur. 2d, Products Liability, § 6, p. 14; 8 Am. Jur. 2d, Bailments, § 144, p. 1039. Some courts have found it necessary to ground such warranties by interpretation of statutory provisions similar to section 2-315, U. C. C. See Pettella v. Corp Brothers, Inc., 107 R. I. 599, 268 A. 2d 699. That case involved the sale of propane and the accompanying bailment of a container which was defective as a result of which a fire ensued. In view of our prior precedent, we do not base our holding upon an extension of the terms of section 2-315, U. C. C. We hold that a contract of bailment of a chattel may give rise to an implied warranty of fitness for the purpose for which the chattel is bailed.

The defendant's complaint with reference to refusal of its requested instructions Nos. 2, 9, and 11 is without merit. The trial court did give NJI No. 11.01 which properly describes the duty *of care* which a bailor for compensation owes to the bailee.

Assignment (7) is likewise unmeritorious. The hose and valve were received into evidence, together with testimony as to how the valve functioned. If the valve was not sufficiently tightened, as claimed by the plaintiff, it is clear that the evidence would support the conclusion that the defect could have been discovered by inspection.

Assignment (8) is without merit. It is undisputed

that the purpose for which the hose and valve were furnished was that of transferring the anhydrous ammonia from one tank to the other. It is self-evident that both parties knew this. Our holding with reference to assignment (5) sufficiently answers the defendant's complaint.

Should the trial court have instructed that assumption of risk was a defense to the action insofar as it was founded upon the claimed breach of an implied warranty of fitness? The defendant points out that in Hawkins Constr. Co. v. Matthews Co., Inc., 190 Neb. 546, 209 N. W. 2d 643, we said: "Considerable discussion and argument is made by the defendants as to the submission of the issue of contributory negligence. It is clear that traditional 'contributory negligence' in the sense of a failure to discover a defect or to guard against it, is not a defense to a suit in strict tort, or for a breach of warranty. Assumption of risk and misuse of the product are. Restatement, Torts 2d, § 402A, Comment n, p. 356." An examination of that case indicates that the holding of the court was grounded upon the principle that one cannot complain of an error which is harmful only to the other party. That statement was therefore dictum. It cannot be considered as necessarily controlling here.

The cases considering the question of whether the defenses of contributory negligence or assumption of risk are available in actions founded upon the theory of breach of warranty are collated in the annotation and supplement thereto at 4 A. L. R. 3d, pp. 505 to 511. The authorities are divided and if we accept at face value the analyses of the writer of the annotation, those authorities are not readily reconcilable. See, also, White & Summers, Uniform Commercial Code, p. 335. Some of the cases analyze the question as one of proximate cause rather than of categorizing and determining the availability of defenses.

This court and others have pointed out that the de-

fenses of assumption of risk and contributory negligence meld where the facts are that the plaintiff is fully aware of the danger and nonetheless proceeds. As applied to the facts of this case, we think the issue may be resolved on the basis of proximate cause. If the accident happened in the manner contended by the plaintiff, i.e., as a consequence of an insufficiently tightened valve and the inadvertent striking of the valve wheel on the applicator tank, then the breach of warranty could be found to be the cause of the accident. If, on the other hand, it occurred as a consequence of the plaintiff's maneuvering the hose by holding the valve wheel, or by his prematurely opening the valve before the connection was made to the applicator tank, then the plaintiff's conduct, and not the breach of warranty, was the proximate cause. We hold that on retrial the jury should be specifically instructed on this point. It is evident, of course, that the resolution of the proximate cause issue depends upon the same credibility determination referred to earlier in our discussion of the weight to be given the experiments and reenactment. At this point it is appropriate to observe that while Schnieder rendered an opinion that the valve was not fit for the purpose for which furnished, i.e., for the transfer of anhydrous ammonia, the only basis for that opinion is the tests and the conditions assumed therein, to wit, that the packing nut was loose and the valve stem only finger tight, so that in this case the facts relied upon to prove one of the acts of alleged negligence, to wit, an insufficiently tightened valve, are the same as those relied upon to prove the breach of warranty and are therefore in this respect "married."

We now consider assignment (10). In its instruction No. 2, the court submitted to the jury, in items 1 and 4 of the instruction, relating to plaintiff's second cause of action, the plaintiff's specifications of negligence pertaining to defendant's alleged failure to

give "adequate" warning of the dangerous propensities of anhydrous ammonia and failure to instruct on safe operating practices in making the transfer from the nurse tank to the applicator tank. The defendant requested an instruction (No. 11) which would have advised the jury that the defendant had no duty to warn "against injury from a danger which is obvious or which is discoverable by reasonable inspection." This instruction the court did not give. The court did not err in refusing the requested instruction. While it is true that the plaintiff knew of the dangerous nature of anhydrous ammonia, the principal danger in this case, under the plaintiff's theory, arose from a valve claimed not to be sufficiently tight. Under the evidence, this danger would not be obvious. If there was anything wrong with the valve it could not be discovered by a mere visual inspection and the valve obviously could not be dismantled while there was anhydrous ammonia under pressure in the hose.

With reference to the submission of items 1 and 4, the court did not err. It cannot be said, even though a plaintiff knew the dangers of anhydrous ammonia, that a warning of the type required by the safety standards would not have been heeded, just as it cannot be assumed that if goggles or a face mask had been furnished that plaintiff would not have worn them. Neither can it be assumed that an instruction by defendant to the plaintiff on safe operating practices, such as not handling the hose by the valve wheel, would not have had effect. Admittedly, detailed warnings of any type were not given. These were matters for the jury's determination.

The defendant claims that the court erred in refusing to instruct that the plaintiff was guilty of contributory negligence sufficient as a matter of law to bar recovery. This position has no merit. The facts are in dispute as to how the accident occurred. Defendant's contention might possibly have merit if the

plaintiff had admitted that he had handled the hose by the valve wheel, or had admitted opening the valve before securely attaching it to the applicator tank. The failure of the plaintiff to use goggles is argued as contributory negligence as a matter of law, but this was not one of the items of contributory negligence pleaded by the defendant.

The defendant introduced evidence to show that on June 11, 1974, three days after the accident the same nurse tank, hose, and valve, without the condition of any part thereof being altered or changed in any way from what it was when the tank was removed from the plaintiff's farm after being emptied a few days following the accident, were, after the nurse tank had been refilled, used by another farmer to fill his own applicator tank. Later, the testimony of this farmer was offered to show that he used the valve on June 11, 1974, without incident or problem and that the valve was then tight. This offer was refused by the court. We hold that the evidence was relevant and admissible for the purpose of tending to show the absence of the defect in the valve claimed by the plaintiff. Section 27-401, R. R. S. 1943, of our Nebraska Evidence Rules says: "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Section 27-403, R. R. S. 1943, says: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The proffered evidence, even though of an event subsequent to the accident, would seem to be at least as relevant, reliable, and probative as the "reenactment" and the Schnieder experiments. See, also, Rickertsen v. Carskadon, 169 Neb.

744, 100 N. W. 2d 852; McCormick, Evidence 2d, §
200, p. 477; 1 Hursh, American Law Prod. Liab. 2d, §
1:34, p. 110; 42 A. L. R. 2d 1057. Under the facts of
this case, we believe the trial court abused its dis-
cretion in not receiving the evidence.

REVERSED AND REMANDED FOR A NEW TRIAL.

BOSLAUGH, J., concurs in result only.