**TAYLOR AND GASKIN, INC.,**
**Plaintiff-Appellee,**

v.

**CHRIS–CRAFT INDUSTRIES,**
**Defendant-Appellant.**

No. 80–1387.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 1, 1983.

Decided April 12, 1984.

Timothy D. Wittlinger, Detroit, Mich., Nancy L. Hutcheson argued, Detroit, Mich., for defendant-appellant.

Robert W. Appleford, argued, Dahlberg, Mallender & Gawne, David M. Gaskin, Detroit, Mich., for plaintiff-appellee.

Before JONES and KRUPANSKY, Circuit Judges, and NEESE, Senior District Judge.[*]

KRUPANSKY, Circuit Judge.

In this appeal from the Eastern District of Michigan, Southern Division, defendant-appellant Chris-Craft Industries (Chris-Craft) has challenged the district court's refusal to award Chris-Craft consequential damages which assertedly resulted from plaintiff-appellee's negligence and breach of express and implied warranties of merchantability. The plaintiff-appellee, Taylor & Gaskin, Incorporated (Taylor & Gaskin), has not questioned the lower court's judgment, entered pursuant to a three-day bench trial, that Taylor & Gaskin breached its express and implied warranties of merchantability and was also negligent in the manufacture and sale of painted marine gasoline tanks to Chris-Craft.

The pertinent factual findings of the trial court are as follows. Sometime in mid-1970, Chris-Craft decided to produce a pleasure boat called MXA–25. As conceived, the MXA–25 design departed from predecessor boats in, among other things, the location of the fuel tank at the stern of the craft and attached to the lining of the vessel. In January 1972, Chris-Craft began production of a prototype MXA–25.

Chris-Craft had submitted a blueprint design for the MXA–25 fuel tank to Taylor & Gaskin. Because the MXA–25 was designed to meet existing competitive prices, Chris-Craft, through its buyer Robert B. Densmore (Densmore), discussed with Taylor & Gaskin the feasibility of utilizing a less expensive "slush compound tank" on the MXA–25. Previously, Chris-Craft had employed only "hot dipped galvanized" fuel tanks on its gasoline-powered motor-craft;

---

[*] The Hon. C.G. Neese, Senior Judge, Middle District of Tennessee, sitting by designation.

the slush compound tank was a painted-exterior unit. Although Chris-Craft had used painted tanks on its diesel boats, it had never used them on gasoline engine powered boats such as the MXA–25. Further, Taylor & Gaskin had no previous experience with the then-new slush compound method of construction. Accordingly, the trial court found that Chris-Craft and Taylor & Gaskin had equal degrees of expertise with respect to the design and manuf acture of slush compound fuel tanks.

Densmore's contact at Taylor & Gaskin was Earl Wilkins (Wilkins), the manager of Taylor & Gaskin's Tank Division. Densmore told Wilkins that Chris-Craft was desirous of obtaining a tank more economical than the traditional hot dipped galvanized tank. From his prior dealings with the company, Wilkins was aware that Chris-Craft required that all equipment installed on its crafts be approved by the Boating Industry Association (B.I.A.). After discussing the slush compound method with Densmore, Wilkins told him that he would develop a price quotation and that he would also make the necessary inquiries to the B.I.A. regarding approval of the new tanks.

Subsequently, Taylor & Gaskin offered to produce the slush compound unit at a cost which was approximately ten dollars per unit less than the hot dipped galvanized tank. Taylor & Gaskin had also obtained B.I.A. approval of the slush compound tank, which was predicated upon assurances that the tanks would be covered with 1.5 mils of paint; the B.I.A. did not, however, perform any tests to determine the corrosion resistance of painted tanks. Taylor & Gaskin covered the tanks with one coat of red enamel paint, which did provide at least a 1.5 mil thickness.

Wilkins knew that these fuel tanks would be exposed to the marine environment and, although he was unaware of Chris-Craft's intentions relative to the unique placement on the MXA–25 of the tanks, he was found to have known—prior to production—that the tanks would be unable to resist corrosion in the marine environment and were therefore not suited for marine use. Wilkins' own estimate was that the tanks would last one year, two at the most. Nevertheless, Wilkins did not communicate this knowledge to Chris-Craft. Two prototype tanks were subsequently produced, one was given to Chris-Craft and one was retained by Taylor & Gaskin. Neither company conducted corrosion tests on the tanks, but Chris-Craft did conduct pressure tests.

Chris-Craft remained unaware of the tank's inability to withstand the marine environment when, between September 1972 and June 1973, it purchased 550 tanks from Taylor & Gaskin. Sometime in July 1973, Chris-Craft learned that the B.I.A. intended to delete the Taylor & Gaskin tank from its approved equipment list as of August 1st of that year. Upon learning of the impending change, Chris-Craft began ordering hot dipped galvanized tanks for the MXA–25. Prior notice of this change notwithstanding, Chris-Craft installed another 100 slush compound units before the B.I.A. acted to officially withdraw its approval. The trial court found that as of August 1, 1973, Chris-Craft returned to installing the traditional tank into the MXA–25.

In April 1974, Chris-Craft received the first of numerous customer complaints regarding corrosion of the slush compound fuel tanks on the MXA–25. At least two of the failures were attributable to factors other than the painted exterior, i.e., weld leaks and faulty installation. By May 1974, Chris-Craft began to suspect that the Taylor & Gaskin fuel tanks were "built in failures". Later that month, Chris-Craft notified Taylor & Gaskin of the complaints and suggested that the two companies effect a joint recall of the slush compound tanks. Taylor & Gaskin responded that the responsibility for tank problems was on Chris-Craft and that Taylor & Gaskin would not participate in a recall effort.

In December 1974, David F. Butler (Butler), Chris-Craft's Chief Mechanical Engineer, conducted an investigation of the fuel tank complaints. Butler's March 17, 1975

report concluded that the rusting was caused by the breakdown of the exterior paint. Butler further concluded that the B.I.A. testing was inadequate, but that the tanks were constructed pursuant to Chris-Craft specifications. At about the same time, the Chris-Craft service department contacted several Chris-Craft dealers, who immediately inspected sixty-six tanks. Forty-three of those tanks demonstrated rusting. On March 18 and 19, 1975, Chris-Craft alerted all of its dealers to the rust problems.

On March 28, 1975, Chris-Craft initiated a voluntary recall campaign to replace the painted tanks with hot dipped galvanized units. Taylor & Gaskin responded to the recall by threatening Chris-Craft with a trade libel suit.

On June 3, 1975, Taylor & Gaskin initiated this diversity action to obtain $10,681.39 due and owing as payment for the slush compound tanks. Chris-Craft admitted the amount was unpaid and counterclaimed alleging negligence and breach of warranties. A three-day bench trial ensued.

Pursuant to trial, the district court found that Taylor & Gaskin had provided Chris-Craft with express and implied warranties of merchantability. However, because Chris-Craft did not rely on Taylor & Gaskin's "expertise", and because the two companies were found to have equal levels of expertise, the district court concluded that no warranty of fitness for a particular purpose had been made by Taylor & Gaskin.

The district court also held that Chris-Craft had conducted a reasonable inspection of the tanks and that its failure to test for corrosion resistance was not unreasonable (the court further found that there was at the time no reliable corrosion test available). The trial court determined that, although Chris-Craft designed the tank and elected the painted external process for competitive reasons, Chris-Craft's design specifications did not exclude the use of two coats of paint—the selection of the number of coats utilized was specifically held to have been a manufacturing decision and not a design element. The court further held that the tank's defect was "attributable to a manufacturing process, the use of one coat of paint" and further:

> [T]he failure to apply two coats of paint was a uniform defect in the manufacturing process permitting the conclusion that the tanks were not merchantable at the time of sale.

> \*    \*    \*    \*    \*    \*

[The credited] testimony of Chris-Craft's expert Arthur Claess established that the tank would begin rusting at one to two months and would rust through at two years. Such evidence is sufficient to prove that the tanks were not merchantable at the time they left the control of the manufacturer, that is that they were not fit for the ordinary purpose of holding fuel in a marine environment, U.C.C. 2–314.[1]

The court then surmised that "some portion" of the damages was attributable to Chris-Craft's selection of the painted exterior, its installation design, and the location of the tank on the MXA–25 boats. (However, no attempt at damage apportionment was made by the trial court.)

In arriving at its damage award, the trial court found that the value of the tanks at the time they left the manufacturer was zero; accordingly, Chris-Craft was awarded the contract price of the tanks, $25,-114.58, offset by the stipulated unpaid amount, $10,683.19, for an ultimate award of $14,431.39 on the breach of warranties claim. Taylor & Gaskin has not appealed this judgment.

Chris-Craft's counterclaim had included a claim for consequential damages which rep-

---

1. The trial court also held that Taylor & Gaskin was negligent in manufacturing the tank:

   The failure of Taylor & Gaskin to test for corrosion, to warn of a forseeable failure and/or to take steps in the manufacturing process to reduce susceptibility consistent with the specifications, that is by two coats of paint, all may be said to be negligence in the manufacture of the tank.

   The holding that Taylor & Gaskin was negligent is, however, irrelevant to the disposition on appeal.

resented the costs of the campaign to recall and replace the defective fuel tanks. The trial court held that this was not the proper case for the award of consequential damages because, (1) "Chris-Craft has failed to present any evidence that the costs of recall were within the reasonable contemplation of the parties, either by applicable industry regulations or trade practices", (2) "Chris-Craft failed to perform corrosion tests", (3) rusting was also attributable to installation and design, (4) "[t]he evidence does not establish that removal and replacement of all 550 tanks was 'proximately caused' by Taylor & Gaskin's breach", and (5) because "it cannot fairly be said that a reasonable person would have contemplated at the time of contracting that the entire result of a recall campaign would ultimately be borne by the manufacturer". Chris-Craft has appealed this resolution of its claim for consequential damages.

■ This court's review of the holdings and findings of the trial court is subject to well-settled standards. The lower court's factual findings must be upheld unless they are clearly erroneous. Fed.R.Civ.P. 52(a). *C.I.R. v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)." *Kennedy v. C.I.R.*, 671 F.2d 167, 174 (6th Cir.1982).

■ This court may review *de novo* findings of ultimate facts which result from the application of legal principles to subsidiary factual determinations; moreover, conclusions of law are excluded from the clearly erroneous standard of Rule 52(a), and are therefore also subject to the *de novo* review of this court. *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 143 (6th Cir.1983). The dispositive issue of this appeal is the propriety of the district court's conclusion that the foregoing facts failed to establish a proper case

for the award of consequential damages under the applicable state statutes. The trial court arrived at its conclusion by the application of the statutory law to the facts of the case, accordingly, the district court's holding was a conclusion of law which is "subject to appellate review, and the clearly erroneous rule has no application". *K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106, 1112 (6th Cir.1982), *quoting United States v. Weingarden*, 473 F.2d 454, 460–61 (6th Cir.1973).

■ This action was initiated to recover on a contract for the sale of goods, to a buyer for resale and damages thereunder must therefore be resolved within the dictates of the Uniform Commercial Code, 1962 Mich.Pub.Acts 174, Mich.Comp.Laws section 440.1101 *et seq. See* Mich.Comp. Laws section 440.2102, U.C.C. section 2–102. The damages which are available to the buyer as compensation for the seller's breach under Michigan's Uniform Commercial Code "are intended to place the injured party in as good a position as he would have been in had the promised performance been rendered". *S.C. Gray, Inc. v. Ford Motor Co.*, 92 Mich.App. 789, 810, 286 N.W.2d 34, 43 (1979). Further, these "benefit of the bargain" damages are to be liberally construed and applied. Mich. Comp.Laws section 440.1106, U.C.C. section 1–106.

The fuel tanks here in dispute had been accepted by Chris-Craft. Therefore, the relevant Mich.Comp.Laws section is 440.-2714, U.C.C. section 2–714, which sets forth the buyer's remedies for breach in regard to accepted goods. The pertinent text of 2–714 reads thus:

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Section 2–715, Mich.Comp.Laws 440.2715, in relevant portion, states:

> (2) Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or
>
> otherwise;

■ While the U.C.C. does not define or explicate the section 2–714 phrase "in a proper case", it is well-settled that consequential damages for the breach of warranties are available where such damages occur. That is to say, a proper case for the award of consequential damages is a case in which damages satisfy the requisites of section 2–715(2). The Michigan state courts have consistently applied this principle to cases arising under the Uniform Commercial Code as adopted by the state. In *Martel v. Duffy-Mott Corporation,* 15 Mich.App. 67, 74, 166 N.W.2d 541, 545 (1969), the court held that when the plaintiff successfully proved a "true loss" was suffered as a consequence of the seller's breach of its warranties, under section 2–714(3) and 2–715(2) a "proper case" for consequential damages was established. The facts of *Ambassador Steel Co. v. Ewald Steel Co.,* 33 Mich.App. 495, 190 N.W.2d 275 (1971), are similar to those of the case at bar. Therein, the appeals court allowed consequential damages which had resulted from the seller's breach of warranties of merchantability with respect to steel sold to the buyer for subsequent resale. The state appellate court explained [citations deleted]:

> In the instant case, after the defect in the steel was discovered, the railroad cars [in which the steel had been incorporated by the defendant buyer's customer] had to be recalled, stripped and refabricated. Defendant was charged for these operations by his customer. There is scant authority to support a contention that defendant should not be reimbursed by plaintiff for these charges. Indeed, defendant must recover these charges against him if he is to be put in as good a position as he would have been if the steel had been of commercial quality. If the steel had been of commercial quality in the first place, defendant would not have suffered these charges.

*See also S.C. Gray, Inc. v. Ford Motor Co., supra* (wherein, in dicta, the appeals court stated that the buyer would be "fully compensated for its loss" only if the jury was instructed on consequential as well as immediate damages).

■ The rule which has thus emerged from the state court analyses of sections 2–714(3) and 2–715(2) is that consequential damages which result from the seller's breach of warranties are recoverable to the extent that the seller had reason to know such damages would follow a breach. *See Distco Laminating, Inc. v. Union Tool Corp.,* 81 Mich.App. 612, 621, 265 N.W.2d 768, 773 (1978). Herein, the seller's breach was the delivery of worthless fuel tanks to the buyer, Chris-Craft. Within the terminology of the commercial code, the narrow legal issue presented on appeal for resolution was the foreseeability of Taylor & Gaskin's knowledge at the time of contracting that a breach of warranty as to the merchantability of the tanks would result in recall.[2]

■ Examining these matters in reverse order, the court notes that, under the commercial code, where a seller is guilty of a breach of the contract for the sale of goods, and the buyer alleges consequential

---

**2.** Of course, the recovery of consequential damages is permissible only to the extent that damages "could not reasonably be prevented by cover or otherwise". Mich.Comp.Laws § 440.-2715(2)(a), U.C.C. § 2–715(2)(a). Herein, the district court's finding, that Chris-Craft conducted a reasonable inspection of the fuel tanks and that the failure to test the slush compound tanks to determine the corrosion resistance of the units was not blameworthy, precluded any determination that Chris-Craft could reasonably have prevented its consequential damages. *See Michigan Sugar Co. v. Jebary Sorenson Orchard Co.,* 66 Mich.App. 642, 646, 239 N.W.2d 693, 695–96 (1976).

damages, a factual issue is raised as to the seller's knowledge of the "general needs" of the buyer, relative to the goods sold. That factual issue is obviated by the commercial code in the circumstances of this case. Here, the contract was one between supplier and manufacturer—the tanks were intended for resale by Chris-Craft. It is axiomatic that, under the uniform commercial code, "resale is one of the requirements of which the seller has reason to know within the meaning of [2–715](2)(a)". Mich.Comp.Laws section 440.2715(2)(a), official comment 6, U.C.C. section 2–715(2)(a). Accordingly, the expense of the breach resulted from Chris-Craft's sale of the Taylor & Gaskin fuel tanks was a matter which was charged, as a matter of law, to the knowledge of Taylor & Gaskin at the time of contracting.

The remaining issue for resolution is whether the recall of the defective gasoline fuel tanks resulted from Taylor & Gaskin's breach of warranties. Considering that the fuel tanks posed considerable danger to the purchasers of the MXA–25, Taylor & Gaskin's assertion that its breach did not result in the necessity of the recall is not persuasive. The gasoline tanks had to be recalled and replaced with merchantable units; Chris-Craft's own warranty obligations to its customers required Chris-Craft to fund the replacement. Had the tanks been fit to carry fuel in a marine environment, the recall would not have been necessary. The district court's factual determination that the tanks were worthless at the time they left the manufacturer establishes the propriety of the recall.

Consistent with the foregoing, this court finds that the district court erred as a matter of law when it found that Taylor & Gaskin completely breached its express and implied warranties of merchantability, but denied Chris-Craft its consequential damages.

Because the trial court did not make any findings with regard to the amount of damages incurred by Chris-Craft as a consequence of the breach, the case must be remanded to permit the court below to de-termine, consistent with Michigan's Uniform Commercial Code, the proper award for damages suffered by Chris-Craft as a result of Taylor & Gaskin's breach of warranties.

Accordingly, the judgment is affirmed in part and reversed in part; the case is remanded to the trial court for the determination of consequential damages. The costs on appeal are taxed to the appellee.

NATHANIEL R. JONES, Circuit Judge, concurring.

I concur in the result reached by the Court. Because I believe the majority opinion may be read as holding that Chris-Craft may recover either the entire expense of the recall campaign or only that portion not attributable to its own negligence, however, I write separately.

Chris-Craft states that this case turns upon whether it must prove that Taylor & Gaskin's breach was the sole proximate cause of its recall expenses. The dispositive issue, however, is more accurately phrased as whether Chris-Craft is entitled to recover as consequential damages those recall expenses occasioned by its own negligence or fault. In *Certain-Teed Products Corp. v. Goslee Roofing & Sheet Metal, Inc.*, 26 Md.App. 452, 339 A.2d 302 (1975), a roofing subcontractor brought an action under the Uniform Commercial Code against suppliers of roofing material to recover losses sustained in reroofing a building allegedly caused by defects in the materials. Although that court imposed liability upon a finding that the defendant's breach of warranty was one of two proximate causes of the plaintiff's injuries, the following passage, taken from *Baltimore Transit Co. v. Bramble*, 175 Md. 334, 2 A.2d 416 (1938), is enlightening:

> As a general rule, it may be said that negligence, to render a person liable, need not be the sole cause of the injury. It is sufficient if his negligence concurring with one or more efficient causes *other than the plaintiff's fault*, is the proximate cause of the injury. So that where several causes combine to produce injuries, a person is not relieved from liability because he is responsible for

only one of them, it being sufficient that his negligence is an efficient cause, without which the injury would not have resulted to as great an extent, *and that such other cause is not attributable to the person injured.* Certain-Teed Product Corp., supra [339 A.2d] at 313 [emphasis added].

*See also Herman v. Midland AG Service, Inc.,* 200 Neb. 356, 264 N.W.2d 161 (1978), wherein the Nebraska Supreme Court held that the plaintiff's negligence in using the product supplied by the defendant precluded a finding that the defendant's breach was the proximate cause of plaintiff's injury.

Of similar import, are the decisions in *Signal Oil & Gas v. Universal Oil Products,* 572 S.W.2d 320 (Tex.1978), and *Holm v. Hansen,* 248 N.W.2d 503 (Iowa 1976), which held that where the seller's breach and the buyer's fault or negligence operate as concurring proximate causes of the buyer's injuries, the damage attributable to the buyer should not be found to be a proximate result of the seller's breach.

Although research has uncovered no Michigan cases with facts analogous to those presently before this Court, I am convinced that Michigan courts would adopt the approach taken in the foregoing cases. As the majority opinion correctly points out, the rule in Michigan is that damages for a seller's breach of warranty are intended to place the buyer in as good a position as he would have been had there been no breach. *S.C. Gray, Inc. v. Ford Motor Co.,* 92 Mich.App. 789, 286 N.W.2d 34 (1979). Accordingly, a buyer of steel was allowed to recover as consequential damages the expenses it incurred in recalling its product because of the seller's breach of warranties. *Ambassador Steel Co. v. Ewald Steel Co.,* 33 Mich.App. 495, 190 N.W.2d 275 (1971). The Michigan appellate court reasoned that

... defendant must recover these charges against him if he is to be put in as good a position as he would have been if the steel had been of commercial quality. *If the steel had been of commercial quality in the first place, defendant would not have suffered these charges.* Id. at 505, 190 N.W.2d at 280 (emphasis added).

On the contrary the record before us shows rather conclusively that Chris-Craft would have suffered some recall expense even if Taylor & Gaskin had not breached any warranties. The district court found as a matter of fact that rusting was also attributable to faulty installation, the design of the support chocks, and the location of the tanks in the boat—all factors attributable to Chris-Craft. Of course these factual findings are subject to the "clearly erroneous" standard of appellate review. Chris-Craft has never asserted in this appeal that its own negligence did not contribute to its recall expenses. Accordingly, I believe that Michigan courts would not impose liability upon Taylor & Gaskin for those recall expenses attributable to Chris-Craft's own negligence.[1]

---

1. I recognize that the district court, on remand, may have some difficulty in ascertaining what portion of the cost of the recall is attributable to Chris-Craft's own negligence due to the failure to test the tanks for the cause of rust at or near the time of removal. Because the burden of establishing consequential damages is upon Chris-Craft, I believe any hardship caused by this inability should be borne by Chris-Craft as well.